Robert **INGENITO** and James F. **Cear**, Plaintiffs,

v.

**BERMEC CORPORATION et al.**, Defendants.

Edward **O'SHEA** et al., Plaintiffs,

v.

**STATE MUTUAL LIFE ASSURANCE COMPANY OF AMERICA et al.**, Defendants.

Morton **BICKART** et al., Plaintiffs,

v.

**BERMEC CORPORATION et al.**, Defendants.

Nos. 70 Civ. 4077, 70 Civ. 5306 and 70 Civ. 5644.

United States District Court, S. D. New York.

Oct. 21, 1977.

As Amended Nov. 3, 1977.

Powers & Gross, New York City, for plaintiffs.

Wachtell, Lipton, Rosen & Katz, New York City, for State Mutual Life Assur. Co. of America, Richard H. Wilson and C. John McCloughan, Jr.

Rubin, Baum, Levin, Constant & Friedman, New York City, for Herman L. Meckler, Herbert R. Degnan & Eugene V. Freed.

Paul, Weiss, Rifkind, Wharton & Garrison, New York City, for Collateral Factors Corp. and Benjamin Cohen.

Aranow, Brodsky, Bohlinger, Benetar & Einhorn, New York City, for Budget Financial Corp.

White & Case, New York City, for Civic Southern Factors Corp.

Nemeroff, Jelline, Danzig, Paley & Kaufman, New York City, for West End Livestock, Inc.

Demov, Morris, Levin & Shein, New York City, for Jack Dick.

Morton Ginsberg, New York City, for Herbert Prentice, Robert Segal and Sheldon Bendit.

Glass, Greenberg, Irwin, Pellman & Slade, New York City, for Citor Puig and Victor Puig.

Burns, Jackson, Miller, Summit & Jacoby, New York City, for Trustee for Black Watch Farms, Inc. and Black Watch Herds Corp.

Graubard, Moskovitz, McGoldrick, Dannett & Horowitz, New York City, for Trustee for Bermec Corp.

Curtis, Mallet-Prevost, Colt & Mosle, New York City, for Arthur Andersen & Co.

Cadwalader, Wickersham & Taft, New York City, for Empire National Bank.

Lankenau Kovner, Bickford & Abrons, New York City, for William C. Ragals, Jr.

Joseph Bonura, pro se.

LASKER, District Judge.

Plaintiffs Robert Ingenito and James Cear (hereinafter jointly referred to as Ingenito), Martin Yarvis (Yarvis) and Morton Bickart (Bickart) are (or were) losing investors in the Black Watch Farms, Inc. (Black Watch) enterprise. Our earlier opinion, *Ingenito v. Bermec Corporation*, 376 F.Supp. 1154 (S.D.N.Y.1974), describes the nature of Black Watch, which offered for sale herds of cattle. Purchased herds were maintained by Black Watch; under Black Watch's care, they increased and multiplied. Purchaser-investors hoped for gains in the form of tax avoidance and high resale prices for their animals. These plaintiffs gained nothing: Black Watch filed a petition in bankruptcy in September, 1970. Ingenito, Yarvis and Bickart allege that they consequently lost substantial sums of money.

In late 1970, these plaintiffs and others commenced suit against, among others, Herbert Meckler (Meckler), Eugene Freed (Freed) and State Mutual Life Assurance Company of America (State Mutual). More than a year later, certain plaintiffs amended their complaints and added Arthur Andersen & Co. (Andersen) as a defendant. Meckler and Freed sat on Black Watch's board. Freed was also, at one time, an officer of the corporation. State Mutual was a principal creditor of Black Watch. Andersen acted as Black Watch's independent public accountant.

The complaints alleged that the federal securities laws had been variously violated, by various defendants, in connection with a number of ill-defined transactions. Some of the claims did not survive defendants' motion to dismiss. See, *Ingenito v. Bermec Corporation, supra*, 376 F.Supp. at 1184. On certain of the claims that did survive the earlier motion (and, remarkably, on some that did not) plaintiffs now seek summary judgment against the defendants named above. State Mutual and Andersen cross-move for partial summary judgment against the plaintiffs, urging dismissal of a number of their claims. For reason stated below, the plaintiffs' motions are, in all

respects, denied. Defendants' cross-motions are granted in part and denied in part.

## I.

### Plaintiffs' Motions Against Meckler, Freed, and State Mutual

The factual and legal contentions of the plaintiffs' motions against the respective defendants are discussed in turn.[1]

### A. Yarvis' 10b–5 Claims

Yarvis purchased his herd in September, 1968. At the time he purchased, the Black Watch offering was unregistered. Yarvis saw no prospectus. He was contacted by a Black Watch salesman, who explained the Black Watch program and made representations concerning expected tax savings and profits. At least some of these representations were contained in a "projection sheet," which estimated the resale value of a herdowner's animals.

Completion of the underlying purchase did not mark the end of Yarvis' transactions with Black Watch. The purchase contract gave rise to mutual obligations (for example, in return for additional animals, Yarvis was bound to pay increased maintenance charges), some of which were played out over an extended period of time. In addition, the contract accommodated—either expressly or implicitly—the changing needs and desires of the individual investor. The modifications and periodic fulfillment of obligations are referred to as "late transactions."

### Claims Arising From the Initial Purchase

Yarvis' motion for summary judgment is based on claims arising from both the initial purchase and the late transactions. With respect to the former set of claims, he alleges violations of § 10(b) of the Securities and Exchange Act of 1934, 15 U.S.C. § 78j and Rule 10b–5 thereunder, 17 C.F.R. § 240.-10b–5. In sum, he alleges that: 1) he was not informed of his statutory right to rescind his original contract (which right existed because the herd offering had not been registered in accordance with the pertinent provisions of the Securities Act of 1933) and 2) he relied on a projection sheet that was materially false and misleading. Non-disclosure of the right to rescind needs no further mention in this opinion; it was earlier held that such an alleged non-disclosure did not give rise to a Rule 10b–5 claim. *Ingenito v. Bermec Corporation, supra,* 376 F.Supp. at 1177.

### The Projection Sheet

Like the other moving plaintiffs, Yarvis argues that his initial decision to participate in the Black Watch program, made in September, 1968, was induced by the use of a delusive, deceptively glowing projection sheet (¶ 69 *et seq.,* Yarvis Affidavit). The sheet represented profitable resale rates, which Yarvis claims were false. On this branch of his claim, he seeks summary judgment against Meckler only, on the theory that he was liable for the use of these misleading sheets, either as a control person, under § 20(a) of the Securities and Exchange Act of 1934, 15 U.S.C. § 78t, or as an aider and abettor.

The projection sheets were blank forms, apparently filled in by individual salesmen in the course of oral presentations made to prospective investors. (See Exhibit 62, Yarvis Class Action Affidavit; ¶ 19(f), Marshall Affidavit).

It seems that—and this can only be established at trial—the salesmen used the sheets

---

1. Reference to the "facts" is more properly a reference to a version of the facts, and not to findings on our part. Almost every issue of fact in this case is vigorously disputed; but for the purpose of explaining the claims and outlining the triable issues, a provisional truce is necessary. Unless otherwise indicated, the details drawn do not represent findings of fact.

A persistent difficulty in determining these motions has been the protean quality of plaintiffs' claims. What is currently asserted as a basis for summary judgment is often nowhere to be found in the original or amended pleadings. Some original claims have been retracted. Others have blossomed; but whether the claims are viewed broadly or narrowly, the applicable legal principles require denial of plaintiffs' motions.

as a device to demonstrate the economics of herd ownership. Plaintiffs concede that the use of the projection sheets constituted only a part of the sales presentation that was routinely offered to investors. "The salesman," claims plaintiffs' counsel "gave his 'pitch' in the living room . . . and the projection sheet . . . was the keystone in a personalized sales talk." (Amended Brief at 142). Oral representations accompanied the "documentary" presentation. As was noted in our earlier opinion, the sheets had no meaning without the oral and written representations that an individual salesman made to the individual investor:

> "As plaintiffs' supporting affidavits make clear, (and indeed, as the complaints claim on their face) a Black Watch salesman made his sales presentation in person. Consequently, not only the various figures embodied in the projection sheet, but also their context and significance would present individual issues of fact . . . ." *Ingenito v. Bermec Corporation, supra*, 376 F.Supp. at 1166–7.

Some of the factual issues raised by claims arising from use of the projection sheets have already been mentioned:

> "Quite apart from the fact that the sales were made over a period of time, while cattle prices (and consequently the accuracy of any projections) fluctuated, the precise quality of the representations—which might range from a solid guarantee or representation of fact to a carefully hedged, highly contingent opinion—would have to be separately proven at trial as to each plaintiff to establish liability." *Id.* at 1169.

None of the papers submitted subsequent to our earlier opinion obviates the need for a trial of this claim. Defendants' responsive papers raise a host of triable issues: the manner and context in which the projection sheets were used; what, if any, representations were made during the oral presentation; whether the projection sheets were in fact false; whether the information contained in those sheets was material; and

whether Yarvis relied on that information. The list is meant to exemplify, not exhaust, the triable issues.

■ Other issues are open here. Liability of Meckler is said to attach by virtue of his being a control person. The determination of whether control person liability exists necessarily involves a series of factual inquiries. Under § 20(a) a control person *may* be liable for the misdeeds of those who act under his direction. However, § 20(a) does not impose liability automatically; it is not a statutory incarnation of the common law theory of *respondeat superior.* Only those "who are in some meaningful sense culpable participants in the fraud perpetrated by controlled persons," *Lanza v. Drexel Co.*, 479 F.2d 1277, 1299 (2d Cir. 1973) (en banc), are meant to come within the ambit of the provision for vicarious liability. *Accord, Gordon v. Burr*, 506 F.2d 1080 (2d Cir. 1974). If this is not apparent from the affirmative language of § 20(a), it becomes clear upon a reading of the exculpatory provision of that section, which permits a control person to assert the defense that he or she "acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action." 15 U.S.C. § 78t(a).

■ Knowledge is the key to the assertion of good faith, and the existence of culpable knowledge perforce involves genuine questions of fact. Those who neither know nor have reason to know of an agent's misdeeds are not liable as control persons. *Lanza v. Drexel & Co., supra*, 479 F.2d at 1300–04. On the issue of constructive knowledge, the inquiry centers on whether adequate mechanisms were established to discover and prevent the alleged fraud. *Barthe v. Rizzo*, 384 F.Supp. 1063, 1069 (S.D.N.Y.1974). If the perpetration of fraud went unnoticed because of willful or reckless disregard, the good faith defense is unavailable. *Lanza v. Drexel & Co., supra*, 479 F.2d at 1306.

■ Determination of liability as an aider-abettor also involves questions of fact. Such liability attaches only when one "has

actual knowledge of another's improper scheme plus an intent to further that scheme (i. e., scienter), and he has given substantial assistance to the primary wrongdoer . . ." *Rosen v. Dick* [1974–75] C.C.H. Fed.Sec.L.Rep. ¶ 94,786 at 96,604 (S.D.N.Y.1974); *accord, Landy v. Federal Deposit Insurance Corporation*, 486 F.2d 139, 162–3 (3d Cir. 1973), *cert. denied*, 416 U.S. 960, 94 S.Ct. 1979, 40 L.Ed.2d 312 (1974); *Lanza v. Drexel & Co., supra*, 479 F.2d at 1289, 1302–4, 1309. The showing required to establish actual knowledge, intent and substantial assistance obviously involves a parade of facts.

■ Application of the above principles to the claim that Meckler is secondarily liable for the fraudulent misstatements and omissions demands that the motion be denied. Before Meckler may be held liable for the use of the projection sheets, Yarvis would have to establish that Meckler knew, or should have known, that the sheets were being used as representations in connection with the sale of herds, that he knew they were false, and that he encouraged—actively, or by way of culpable passivity—their continued use. Plaintiff has proven none of this. Yet Meckler denies, by way of undisputed affidavit, that he was involved in the daily management of Black Watch (¶¶ 11, 12, Meckler Affidavit); specifically, he denies that he was aware of the sales techniques that were employed (¶ 27, Meckler Affidavit). His liability, if any, as a control person or as an aider-abettor must be resolved at trial.

*Claims Arising From the Late Transactions*

Regarding his late transactions, some of which were earlier held to be sales of securities (see, *Ingenito v. Bermec, supra*, 376 F.Supp. at 1178–1184), Yarvis alleges that material information was withheld from him. He was not told that State Mutual was, as he claims, an underwriter and promoter of Black Watch. He was not informed that Black Watch was in the midst of serious financial difficulties. For these claimed violations of Rule 10b–5, Yarvis seeks summary judgment against Meckler,

Freed, and State Mutual. They are said to be liable as participants, abettors, or "control" persons within the meaning of the '34 Act. In addition to the general assertions of liability, there is an allegation that State Mutual is liable, as an underwriter, for nondisclosure of its own underwriter-promoter status.

■ The late transactions in issue here are, at first, broadly referred to by Yarvis as "investment decisions" that were made during the period October, 1969 through September, 1970. Specifically, these transactions consisted of: payments by Yarvis on promissory notes by which he had originally prepaid his maintenance charges; a cash payment of maintenance in December, 1969; the receipt of "free," additional animals, in fulfillment of Black Watch's promise that herds would reproduce at a specified rate; and receipt of replacement animals for those that did not live up to the quality that Black Watch had earlier warranted. There is no need to deal further with any claims arising out of the payments on the promissory notes. Those monthly installments cannot be characterized as sales of securities, for they involved not "the creation or assumption of new obligations, but the fulfillment of those [obligations] previously created." *Ingenito v. Bermec, supra*, 376 F.Supp. at 1884. As for the rest of the late transaction claims, Yarvis' motion is denied, for reasons discussed below.

■ To begin with, the dates and circumstances of the late transactions are not clearly pleaded (in fact, they are not pleaded at all, but rather, are casually adverted to in counsel's supporting memoranda). Certainly, they have not been established with the degree of specificity that would be required, as a preliminary matter, for a grant of summary judgment. Where, as here, liability is claimed to exist by virtue of a defendant's attainment of a particular status, the necessary inquiry cannot even begin if the dates of attainment cannot be measured against the dates of the claimed violations.

■ More fundamental reasons compel denial of this aspect of Yarvis' motion. Insofar as Yarvis contends that the defendants were implicated in the culpable misrepresentation of Black Watch's financial condition, he implies that they knew what that condition was. Putting aside the state of each defendant's mind, it is apparent that Black Watch's actual financial condition, in late 1969 and 1970, was controversial. For example, State Mutual read Black Watch's 1969 financial statement (Ex. 6, Yarvis Class Action Affidavit) as a positive report. In partial reliance on it, they committed $3,000,000. to Black Watch in November, 1969 (¶¶ 92–96, Sterling Affidavit). Plaintiffs, on the other hand, point to this very financial statement as proof of Black Watch's bleak expectations (Amended Brief, *passim*).

What each defendant knew about Black Watch's condition poses substantial questions of fact. State Mutual and Meckler offer evidence that they knew neither of the bleak financial picture that Yarvis alleges nor of any misrepresentations thereof. On the contrary, both defendants claim that they thought Black Watch was an essentially sound organization in the middle of a temporary cash flow crisis (¶ 21, Meckler Affidavit; ¶ 14, Wilson Affidavit; ¶ 19, Sterling Affidavit). Each loaned substantial sums of money to Black Watch during the very period that Yarvis claims Black Watch was on its way down (¶ 22, Meckler Affidavit; ¶¶ 20, 21 Sterling Affidavit; ¶¶ 13, 14, 18, Wilson Affidavit). State Mutual, for example, advanced three million dollars to Black Watch in November, 1969, and continued, during 1970, to pump money in. It was apparently relying on the '69 financial statements, which showed that Black Watch was operating at a profit. It cannot be concluded on the present record that Meckler would lend hundreds of thousands of dollars, and State Mutual millions, to a company that each believed to be on the verge of bankruptcy. At the least, the making of these loans raises a question as to what the defendants knew and in good faith believed about Black Watch's actual financial position.

Secondary liability (claimed as an alternative basis for holding the defendants responsible for the alleged misdeeds) raises several factual issues. We have adverted to these matters above (see *supra*, at 533–534) and need not reiterate the elements of control person or aider-abettor liability, or the defenses available to such persons. All defendants have created issues of fact as to whether they knew what Black Watch's financial condition actually was, whether they knew or should have known that it was being misrepresented, and whether they encouraged any misrepresentations.

Yarvis also contends that nondisclosure of State Mutual's "underwriter-promoter" role amounted to a violation of Rule 10b–5 (Amended Brief at 120, *et seq.*). At this reading, the underwriter claim is a fanciful machination, advanced with frightening nonchalance. In its articulation, plaintiffs' counsel misstates the law and misrepresents reported cases.

■ In developing the claim, counsel makes no reference to the relevant statutory provision, § 2(11) of the '33 Act, 15 U.S.C. § 77b(11). Section 2(11) provides, in pertinent part, that:

> "The term 'underwriter' means any person who has purchased from an issuer with a view to, or offers or sells for an issuer in connection with, the distribution of any security, or participates or has a direct or indirect participation in any such undertaking, or participates or has a participation in the direct or indirect underwriting of any such undertaking . . . ."

It is apparent that to be an underwriter within the meaning of the '33 Act, one must participate, in some manner, in the distribution of securities to the public. But neither plaintiffs nor their counsel have alleged that State Mutual ever purchased a Black Watch security—either from Black Watch or an intermediate underwriter—with an eye to public redistribution. Nor has it been argued (much less pleaded) that State Mutual ever sold a Black Watch security, or

acted on behalf of Black Watch by paving the way for a public sale. In short, it emerges that counsel has confused the colloquial meaning of the word "underwriter" —a backer or lender—with the statutory definition of that term. Counsel's claim rests entirely on a Joycean—and largely incorrect—analysis of a loan agreement dated November 22, 1968 (Ex. O, Katz Class Action Affidavit). Pursuant to that agreement State Mutual and others lent $5,400,-000 to Black Watch ($4,400,000. was advanced to the Black Watch partnership; the other money went to Black Watch, Inc., which ultimately absorbed the partnership) and secured the loan with herdowner notes.

■ Even if counsel's characterization of the loan agreement were correct—it is not [2] —his underwriter allegation would fail as a matter of law. He has not alleged any activity by State Mutual that would bring it within the meaning of the term, as it appears in the statute and as it has been interpreted by case law. An underwriter buys securities directly or indirectly from the issuer and resells them to the public, or he performs some act (or acts) that facilitates the issuer's distribution. He participates in the transmission process between the issuer and the public. See, *Securities Exchange Commission v. Management Dynamics, Inc.,* 515 F.2d 801, 810 (2d Cir. 1975); *Securities Exchange Commission v. North American Research and Development Corporation,* 424 F.2d 63, 72, 81 (2d Cir. 1970); *United States v. Wolfson,* 405 F.2d 779, 782 (2d Cir. 1968); *Securities Exchange Commission v. Culpepper,* 270 F.2d 241, 246 (2d Cir. 1959); *Securities Exchange Commission v. Chinese Consol. Benev.,* 120 F.2d 738, 739, 741 (2d Cir. 1941).

■ At the very best, counsel's allegations amount to a charge that, as a lender, State Mutual stood *behind* Black Watch. Every creditor stands behind his debtor; but to prove that someone is a creditor cannot—in and of itself—suffice to establish a claim that someone is an underwriter.

State Mutual, by way of cross-motion, asks for dismissal of the underwriter claim pursuant to Rule 56 of the Federal Rules of

---

2. Counsel's treatment of the 1968 loan agreement ignores the plain terms of the document. The various contentions are discussed in order.

The first claim is that "[t]he loan contract says State Mutual lends $5.4 million and commits an additional $9.6 million to BW [reference is made to the agreement, Section 1.01(b)] . . . making itself prospective underwriter for the whole future BW sales program. This wasn't the lending business; it was investment banking." (Amended Brief at 99). In fact, the loan contract "said" that State Mutual agreed to lend $5 million to Black Watch, Inc. (Section 1.01(a)). Furthermore, Section 1.01(b) does not contain a promise to advance additional funds. Rather, it clearly states that if Black Watch wishes to negotiate additional loans, it must first obtain the approval of the lenders that were parties to the November, 1968 agreement.

Next, counsel claims that "State Mutual even had the right to sell back any receivables . . . to BW which it did not wish to hold, because of trouble with the investor . . . . It had a 'put' on any securities taken in its standby capacity to sell them back to BW for other securities or cash." (Amended Brief at 121–22) Reference is made to Section 5.05 of the agreement. Examination of that section reveals that State Mutual never owned any Black Watch notes, the notes were pledged—to Black Watch, Inc., not State Mutual—as collateral for the loan. Moreover, what counsel refers to as a "put" is nothing more than a provision permitting State Mutual to demand replacement of bad collateral with good. Distilled, Section 5.05 provides that where there was any dispute between an investor and the Black Watch partnership (concerning performance of the underlying contract) the notes of that investor could not be used as collateral.

In his next claim, counsel for the plaintiffs argues that State Mutual "required a successful offering to build up to the collateral level contemplated in its loan agreement . . . State Mutual too needed the public offering [presumably because it would generate additional herdowner notes] to protect its position." (Amended Brief at 122). He claims that $6,750,000 worth of notes were required and that only $5,500,000 worth were available at the time of the closing. The loan agreement contemplated that advances to the Black Watch partnership were to be collateralized by herdowner notes whose aggregate value was 125% of the advance. The advance to the partnership was $4.4 million. 125% of that sum is $5.5 million. Counsel concedes that $5.5 million worth of herdowner notes were available. There was no collateral shortfall. State Mutual had neither the need nor the inclination to involve itself in Black Watch's public offerings.

Civil Procedure. It has not been factually established that State Mutual was *not* an underwriter. However, plaintiff's claim, "pleaded" for the first time by way of memorandum, comes without a shred of evidence. Moreover, as our discussion indicates, the claim is insufficient as a matter of law. Therefore, pursuant to Rule 12(b) of the Federal Rules of Civil Procedure, plaintiff's claims against State Mutual are dismissed insofar as they allege liability for failure to disclose underwriter status, and plaintiff's motion for summary judgment on this aspect of his claim is denied.

It follows that Yarvis' further request for summary judgment, based on his contention (again by way of memorandum) that *as an underwriter,* State Mutual was obliged to reveal that it was a promoter of Black Watch, is also denied. This would be true even if Yarvis had established that State Mutual was an underwriter, because we find that State Mutual was not a promoter of Black Watch.

The definition of a promoter is set forth in S.E.C. Rule 405, 17 C.F.R. § 230.405. (The pertinent part of the definition is reprinted here):

"(q) Promoter. The term 'promoter' includes:

(1) Any person who, acting alone or in conjunction with one or more other persons, directly or indirectly takes initiative in founding and organizing the business or enterprise of an issuer;

(2) Any person who, in connection with the founding and organizing of the business or enterprise of an issuer, directly or indirectly receives in consideration of services or property, or both services and property, 10 percent or more of any class of securities of the issuer or 10 percent or more of the proceeds from the sale of any class of securities . . ."

Plaintiff's argument that State Mutual was Black Watch's promoter is made in these words: "The 10% or more interest in proceeds of an offering (promoter definition) in SEC Rule 405 . . . also fits State Mutual—the proceeds here were investor notes and well over 10% went to State Mutual (some $8 million ultimately went to it), with all cash proceeds thereon funneled through it—all undisclosed." (Reply Brief at 90). No citation to the record is offered in support of the promoter theory and no legal authority is cited. Counsel, relying entirely on the November, 1968 loan agreement, simply asserts: 1) that State Mutual's status as a lender was sufficient to establish its status as a promoter under 17 C.F.R. § 230.405(q)(1) and 2) that herdowner notes held as collateral were proceeds, remitted to State Mutual (See, 17 C.F.R. § 230.405(q)(2)). State Mutual asks for dismissal of this branch of plaintiff's claim and its request is granted.

Once again, plaintiff's counsel has confused the colloquial meaning of "promoter" with its statutory import. As a matter of law, State Mutual's loan to Black Watch does not constitute taking "initiative in founding and organizing the business or enterprise" of Black Watch. See C.F.R. § 230.405(q)(1). To be found a promoter within the meaning of that subsection, one must either be active in the issuer's business, see, e. g., *Shawnee Chiles Syndicate,* 10 S.E.C. 109, 115 (1941); *American Tung Grove Developments, Inc.,* 8 S.E.C. 51, 56 (1940), or actively engaged in the formation of the issuer. The latter form of promoter activity invariably involves more than a general loan to an issuer (which is all that plaintiffs have offered in support of this branch of their promoter claim), c. f., *Doris Ruby Mining Company,* 4 S.E.C. 427, 433 (1939); to be an active participant in formation, one must be involved either in the transactions by which the issuer acquires the properties essential to the conduct of its business, *National Lithium Corporation,* 40 S.E.C. 746, 749–50 (1961); *Resources Company International,* 7 S.E.C. 689, 732 (1940); *Platoro Gold Mines, Inc.,* 3 S.E.C. 872, 875–76 (1938); *Ypres Cadillac Mines Limited,* 3 S.E.C. 42, 46–49 (1938), or in the mechanics of the underwriting and registration processes. *Shawnee Chiles Syndicate, supra,* 10 S.E.C. at 115; *Resources Company International, supra,* 7 S.E.C. at 732; *Ypres Cadillac Mines Limited, supra,* 3 S.E.C. at 46–49.

As for State Mutual's claimed receipt of proceeds, the terms of the loan agreement are clear; herdowner notes were held as collateral, and they were held by Black Watch, not State Mutual:

"Section 5.01. The Secured Notes shall be secured by Partnership Notes as follows: To State Mutual a Partnership Note in the sum of $4,048,000; to Citizens $176,000; to Worcester $132,000; and to Beacon $44,000. The Partnership hereby consents to the pledge of the Partnership Notes and the consequent pledge of the collateral security for the Partnership Notes, hereinafter referred to, being the collateral security for the Secured Notes.

Section 5.02. As collateral security for the Partnership Notes, the [Black Watch] Partnership agrees to pledge to the [Black Watch, Inc.] Company notes receivable of the Partnership which shall at all times have an aggregate unpaid principal amount due and to become due thereunder of at least one hundred and twenty-five (125%) per cent of the unpaid principal amount of the Partnership Notes. Such notes receivable are hereinafter referred to as 'Notes Receivable.'" (Ex. O, Katz Class Action Affidavit)

Accordingly, State Mutual's request to dismiss the promoter claim is granted.

### B. Bickart's 10b–5 Claims

*Claims Arising From the Initial Purchase*

Bickart bought his herd in June, 1969. By then the Black Watch offering had been registered. Before he purchased his herd, Bickart saw both a May 26, 1969 prospectus (hereinafter, the May Prospectus) and a projection sheet. He claims that the May Prospectus was misleading in its failure to reveal both the precarious position of Black Watch as well as State Mutual's underwriter-promoter status. He claims that the projection sheet deluded him by falsely representing the resale value of his animals. He seeks summary judgment against State Mutual on the theory that its failure to reveal its true status amounted to a violation of Rule 10b–5, for which State Mutual is liable as a participant, aider-abettor, and underwriter.[3] Bickart also seeks summary judgment against Meckler, on the theory that he was liable both for the failure to disclose adverse data in the May Prospectus and for the use of the misleading projection sheet.

Claiming fraud in connection with his original purchase, Bickart raises factual issues similar to those raised by Yarvis. For the reasons stated above, Bickart's request for summary judgment on claims arising from his initial purchase is denied. See, *supra*, at 532–533 (the projection sheet); 535 (determination of Black Watch's "true" financial position); and 533–534 (direct and vicarious liability).

### Claims Arising From the Late Transactions

Like Yarvis, Bickart made "investment decisions" from the time of his initial purchase to the date of Black Watch's demise. Specifically, he alleges: 1) maintenance payments under a "split progeny" program, in which Bickart gave calves instead of cash to cover maintenance charges (the dates and circumstances of these in-kind payments are not provided) and 2) an exchange of promissory notes in March, 1970, which allowed Bickart additional time to pay for his original herd.

With respect to these late transactions, Bickart claims that he was kept ignorant of important and adverse financial developments. All defendants are said to be liable under § 10b–5, as participants, aiders-abettors, and control persons.

The particulars, dates and circumstances, of Bickart's late transactions are not provided. Nevertheless, summary judgment is requested against all defendants under a number of theories of liability (primary and secondary). It has already been explained that determination of Black Watch's financial status—as it was in late 1969 and 1970 —poses significant factual questions. See, *supra*, at 535. Whether, and how, this

---

**3.** The underwriter-promoter claim is dismissed, for reasons stated *supra*, at 535–538.

condition was conveyed to Bickart also involves questions of fact. Whether the defendants are, as a matter of law or fact, directly or indirectly liable for the claimed omissions involves additional factual issues. See, *supra*, at 533–534. In short, summary judgment is inappropriate here.

### C. Ingenito's 10b–5 Claims

Ingenito bought his herd in December, 1969, and never engaged in late transactions. He saw the May Prospectus and a projection sheet (whose form was standard, but whose contents changed from presentation to presentation). Fraud is alleged because true and material information was withheld (the May Prospectus was silent on both Black Watch's ominous prospects and State Mutual's underwriter-promoter role— on this latter failing, see our discussion, *supra*, at 535–538) while false information was offered (the lying projection sheets). For the claimed violations of 10b–5 all the defendants are alleged to be liable as participants, abettors, and control persons.

The host of factual issues raised on this motion has already been discussed.[4] Summary judgment for Ingenito is denied.

\*　　\*　　\*　　\*　　\*　　\*

■ In short, the moving plaintiffs are not entitled to summary judgment on their claims that Rule 10b–5 was violated. We repeat that our recitation of unresolved issues serves merely to illustrate, not demarcate, the range of questions that are raised by the pleadings and motion papers. To state a claim under 10b–5, one must plead and prove a variety of elemental propositions, not the least of which is that the claimed misconduct was knowing or willful, and motivated by an intent to deceive, manipulate, or defraud. *Ernst & Ernst v. Hochfelder*, 425 U.S. 183, 193, 197, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1975). To settle liabilities on such a claim, one must overcome defendants' invocation of a variety of available exculpatory circumstances. Nearly every fact relevant to the elemental compo-

nents of a 10b–5 claim, as well as the facts related to exculpation, remains undetermined.

### D. Claimed Violations of the 1933 Act

All plaintiffs move for summary judgment against all defendants for alleged violations of § 5 of the Securities Act of 1933, 15 U.S.C. § 77e.

Yarvis contends that during his late transactions (recited *supra*, at 534) he was not furnished with a prospectus. Continued failure to deliver such a document constitutes a violation of § 5(b)(2) of the '33 Act, 15 U.S.C. § 77e(b)(2). Bickart acknowledges receipt of a prospectus during the period covering his late transactions, but claims that the prospectus he received was, by statutory standards, actionably defective, in violation of § 5(b)(1) of the '33 Act, 15 U.S.C. § 77e(b)(1). Like Bickart, Ingenito claims to have received a flawed prospectus, upon the strength of which he made the initial herd purchase.

The allegations, if true, give all the moving plaintiffs a right of action against the issuer of the securities. § 12(1) of the '33 Act, 15 U.S.C. § 77*l*(1). Control persons may be liable as well. § 15 of the '33 Act, 15 U.S.C. § 77*o*.

Unraveling plaintiffs' claims, one finds clear and distinct issues of fact that preclude the granting of summary judgment.

### Yarvis

Since Yarvis alleges a December, 1969, cash payment (for maintenance charges) and the receipt of replacement and additional animals, and further alleges that these transactions were effected without benefit of prospectus, he states a claim under § 5. *Ingenito v. Bermec Corporation*, *supra*, 376 F.Supp. at 1182–3. Entitlement to summary judgment is another matter.

■ Although the specifics of Yarvis' late transactions are somewhat obscure, it appears that they were negotiated and com-

---

4. See *supra*, at 532–533 (the projection sheets); 535 (determination of Black Watch's "true" financial position); and 533–534 (direct and vicarious liability).

pleted on an individual basis, at his own request.[5] Whether a security is a public offering, requiring compliance of § 5 of the '33 Act by the issuer, is a question of fact. *Securities and Exchange Commission v. Ralston Purina Company*, 346 U.S. 119, 73 S.Ct. 981, 97 L.Ed. 1494 (1953); *Knapp v. Kinsey*, 249 F.2d 797 (6th Cir. 1957), cert. denied, 356 U.S. 936, 78 S.Ct. 778, 2 L.Ed.2d 812 (1956); *Hirtenstein v. Tenney*, 252 F.Supp. 827 (S.D.N.Y.1966). "The ultimate test, of course, is whether the particular class of persons affected need [sic] the protection of the Act . . ." *Securities and Exchange Commission v. Continental Tobacco Company of South Carolina*, 463 F.2d 137, 158 (5th Cir. 1972); *Securities and Exchange Commission v. Ralston Purina Company, supra*, 346 U.S. at 127, 73 S.Ct. 981. Application of the test involves consideration of several factors: the number of offerees, their interrelation, their relation to the issuer, the number and size of the units offered, and the manner of the offering. Moreover, ". . . the exemption question turns on the knowledge of the offerees." *Securities and Exchange Commission v. Ralston Purina Company, supra*, 346 U.S. at 126, 73 S.Ct. at 985. If, as it appears, the late transactions were initiated by Yarvis, a Black Watch veteran, and fitted to his expressed needs, they might well have been private offerings. Such offerings are exempt from the registration requirement of § 5. See, § 4(2) of the '33 Act, 15 U.S.C. § 77d(2). Accordingly, a summary finding that Yarvis' late transactions were public offerings is impossible.

■ Furthermore, even if the late transactions were public offerings, we would nevertheless deny summary judgment on this claim. The 1933 Act, and the registration and prospectus rules issued thereunder (§ 5) do not apply when a security is "exchanged by the issuer with its existing security holders exclusively where no commission or other remuneration is paid or given directly or indirectly for soliciting such exchange." § 3(a)(9) of the '33 Act, 15 U.S.C. § 77c(a)(9). State Mutual contends, and plaintiffs' counsel seems to concede, that Yarvis' late transactions were, by definition, exchanges of old for new securities. The remaining fact issue relevant to the determination of the § 3(a)(9) exemption is whether anyone was paid for the solicitation of the exchange. Defendants do not prove that no consideration changed hands, but they need not do so to defeat a motion for summary judgment. The evidence, such as it is, offered by the plaintiffs is silent on the issue of remuneration. This can probably be attributed to the fact that Yarvis apparently initiated the exchange, without solicitation (Exs. 7B–8, Yarvis Class Action Affidavit). Counsel for Yarvis exhorts us to find indirect remuneration, but offers no evidence. The question is left with the trier of fact, where it properly belongs. *Reserve Life Insurance Company v. Provident Life Insurance Company*, 499 F.2d 715, 722 (8th Cir. 1974).

### Bickart

Bickart's late transactions (see, *supra*, at 538) were allegedly conducted without an updated prospectus, in violation of § 5(b)(1). The factual constellation of these transactions has not been charted. Some appear to have been initiated by Bickart. Others have a distinctive, personal appearance, characteristic of individual tailoring . . . the very antithesis of a public offering. As in Yarvis' case, the question whether Bickart's late transactions were public offerings (as well as the applicability of the § 3(a)(9) exemption) must be decided; but it cannot be decided on these papers, which leave crucial factual questions either untouched or hotly disputed.

### Ingenito

Ingenito seeks recission of his purchase contract. He bought in December, 1969,

---

**5.** In our earlier opinion, we noticed that "a *variety* of devices and concessions were used, on an *individual* basis, when herdowners complained or threatened to stop paying on their notes . . . Consequently, the particulars of the various post-transaction modifications would have to be separately proven, on an individual herdowner basis." *Ingenito v. Bermec Corporation*, 376 F.Supp. at 1170.

and was furnished with a prospectus that he claims was stale. This violation of § 5(b)(1) creates a right to rescind. § 12 of the '33 Act, 15 U.S.C. § 77*l*(1). Those who were control persons may be vicariously liable. § 15 of the '33 Act, 15 U.S.C. § 77*o*.

The most fundamental aspects of the Ingenito purchase, aspects crucial to the determination of the merits of the claim, are in dispute. Ingenito claims to have bought in December, well after State Mutual actually became a control person. Yet there is evidence that the purchase contract was effective in August prior to State Mutual's attainment of control status (Ex. 5, Ingenito Affidavit). Ingenito claims to have relied on the May Prospectus. But his reply brief quotes the following testimony, given by Ingenito during an oral deposition:

"Q: Have you ever seen the document just marked as Exhibit 33 [the November prospectus] before today?

A: I am not sure.

Q: . . . Had you ever seen that prospectus either as part of a document such as the Form S–2 that you are looking at or separate and apart from that?

A: I am not really sure . . ." (Reply Brief at 22).

What Ingenito actually saw before making the investment decision, that is, whether he was furnished a statutorily acceptable prospectus, raises a triable issue of fact.

Finally, as to all plaintiffs' motions on the alleged violations of the '33 Act, there are triable issues as to the defendants' knowledge that the prospectus was outdated. The potential liability of the defendants is based on § 15 of the '33 Act, which makes controlling persons liable for violations committed by others. As we have previously indicated, § 15, by its terms, permits a controlling person to defend on the grounds that he or she "had no knowledge of or reasonable ground to believe in the existence of the facts by reason of which the liability of the controlled person is alleged to exist." State Mutual, pointing to exhibits offered by plaintiffs, presents evidence that during the period of the Ingenito pur-

chase, State Mutual was relying, reasonably, on advice of counsel to the effect that the prospectus would be effective till December 19, 1969. (¶ 123, Sterling Affidavit). As for the other defendants, they too may be able to avail themselves of the defense that at the time that various plaintiffs were involved in sales of securities (purchases, or late transactions) they were innocently unaware that the '33 Act was being violated. These issues cannot be decided on the record as it stands.

\* \* \* \* \* \*

For the reasons stated above, plaintiffs' motions for summary judgment on their claimed violations of § 5 are denied.

II.

*State Mutual's Cross Motions*

State Mutual moves to dismiss all or some of plaintiffs' claims on the following grounds: 1) many of the alleged violations of the '33 Act are asserted untimely; 2) State Mutual was not involved in Black Watch's affairs before November 10, 1969 (when State Mutual acquired 50% of Black Watch's equity), therefore, it cannot be liable for fraudulent acts that are alleged to have been committed by Black Watch before that date; and 3) plaintiffs Yarvis and Bickart have failed to plead damages in connection with the late transactions, which are the source of several of their fraud claims.

*A. Statute of Limitations*

 Yarvis commenced his action on December 4, 1970, Bickart on December 22, 1970. Ingenito sued on September 18, 1970.

State Mutual seeks summary judgment dismissing plaintiffs' '33 Act claims insofar as those claims are time barred. The motion is granted as to that part of Yarvis' complaint that alleges violations of the '33 Act occurring before December 4, 1969, and Bickart's '33 Act claims insofar as they arose before September 18, 1969.

Section 13 of the Securities Act of 1933, 15 U.S.C. § 77m, provides that actions

brought under § 12(1) of the '33 Act, 15 U.S.C. § 77*l*(1), must be commenced within a year of the underlying violations; in no event may such a suit be entertained "more than three years after the security was bona fide offered to the public [for sale]." Two tolling doctrines (class action tolling and equitable tolling) mitigate the effect of the statute. Both are urged by plaintiffs. Only one—the class action doctrine—applies here.

In opposition to State Mutual's motion for summary judgment on the statute of limitations issue, plaintiffs contend that the limitation period did not begin to run until September, 1970, and therefore poses no bar to any of the '33 Act claims (State Mutual argues that the statute of limitations proscribes Yarvis' pre-December 4, 1969 claims and Bickart's pre-December 22, 1969 claims). The doctrine of "equitable tolling," is invoked. No facts are adduced to establish the applicability of the doctrine, which depends on the fraudulent concealment of federally created causes of action. (See, *supra*, 553 n.26), Of the three cases referred to by plaintiffs' counsel, two make no mention of the doctrine. The third is inapposite. This unarticulated theory cannot be entertained.

Plaintiffs further contend that the filing of the Ingenito complaint stopped the running of the statute of limitations with respect to all plaintiffs encompassed by the putative class announced in the pleading. That class contained ". . . persons . . . who purchased investment contracts of Black Watch pursuant to the Prospectus dated May 26, 1969." Bickart, a member of that class, may avail himself of the September 18, 1970 filing date. *American Pipe and Construction Co. v. Utah*, 414 U.S. 538, 552–4, 94 S.Ct. 756, 38 L.Ed.2d 713 (1974), *rehearing denied*, 415 U.S. 952, 94 S.Ct. 1477, 39 L.Ed.2d 568 (1974). This permits him to assert his § 5 claims arising from transactions that took place after (but only after) September 18, 1969. Yarvis is not a member of the "prospectus" class. He cannot take advantage of the Ingenito filing date. *American Pipe and Construction Co. v. Utah, supra.* As to Yarvis, the

statute of limitations ran until December 4, 1970. Therefore, insofar as he claims violations of § 5 occurring prior to December 4, 1969, his action is time barred. 15 U.S.C. § 77m.

■ As it now stands, the record suggests that the three year statute of limitations will prohibit the assertion of both Ingenito's and Bickart's '33 Act claims. As discussed above, Ingenito alleges that he purchased his herd in reliance on an outdated prospectus. Liability would arise under 15 U.S.C. § 77*l*(1). Actions enforcing such liability may not be brought "more than three years after the security was bona fide offered to the public."

The affidavits of the plaintiffs strongly suggest that the herd contract that bound Ingenito was first offered to the public in 1963 (Ex. 47, Yarvis Class Action Affidavit). If it can be proved that the security purchased by Ingenito had been on the market more than three years prior to the filing of his complaint, the complaint would have to be dismissed, insofar as it alleges that the original purchase violated 15 U.S.C. § 77e.

Bickart's Section 5 claims also may be untimely, despite the effect of the class action tolling principle. These claims arose from late transactions, which must be either public offerings or private offerings (within the meaning of the '33 Act). If the transactions are private offerings, Bickart has simply failed to state a claim under § 5. See, § 4(2) of the '33 Act, 15 U.S.C. § 77d(2). On the other hand, the late transactions may be shown to have been public offerings. This would be the case if they were universally available as incidents to the underlying herd purchase. The question of fact remaining is whether any or all of these late transactions—modifications and deferred fulfillment of obligations—were standard features of the basic investment contract. If they were, and if the contract had been offered to the public as early as December 22, 1967, all of Bickart's § 5

claims would be barred by the statute of limitations.[6]

### B. State Mutual's Involvement Prior to November 10, 1969

■ Claiming that prior to November 10, 1969, it was merely a secured creditor of Black Watch, State Mutual moves to dismiss plaintiffs' claims insofar as they allege that before November 10, 1969, State Mutual was a participant, aider-abettor, or control person, within the meaning of the anti-fraud provisions of the federal securities laws. State Mutual also asks for dismissal of plaintiffs' belated claim based on State Mutual's alleged underwriter-promoter status.

As already stated, *supra*, at 535–538, the allegations of State Mutual's alleged underwriter-promoter status are insufficient as a matter of law.

We also find that State Mutual did not attain the status of control person until November 10, 1969. Plaintiffs contend (Reply Brief at 19) that control existed as early as October of that year. This allegation is based entirely on an incomplete reading of the '69 financials. (Yarvis Affidavit, Ex. 6). It does appear that provisional terms for State Mutual's acquisition of 50% of Black Watch's equity were *discussed* in October. (Yarvis Affidavit, Ex. 6, n.10). However, the terms of the final transaction were not fixed, nor the transaction consummated, until November 10. (Yarvis Affidavit, Ex. 6, n.12).

The allegations that, prior to November, 1969, State Mutual participated in or aided and abetted Black Watch's fraudulent activities are dismissed (subject to the conditions discussed below) on the basis of unopposed affidavits submitted by State Mutual. Wilson, in charge of State Mutual's investment programs, was aware of the Black Watch loan transaction. He has sworn that in the period between November, 1968 and November, 1969, State Mutual was nothing more than one of Black Watch's creditors. He swears that State Mutual played no part in the daily affairs of Black Watch, either prior to November 1969 (¶¶ 5(b), 12, Wilson Affidavit), or thereafter (¶ 16, Wilson Affidavit).

Plaintiffs have offered no evidence to contravene Wilson's denial of pre-November, 1969 implication, and we would ordinarily be inclined to grant summary judgment unconditionally forthwith, in light of such a failure to raise a question of fact. However, because of the strong policy against summary judgment in this Circuit, and because of the peculiar history of this case (in which discovery was initially limited to issues concerning class action status, and as to which discovery has, *de facto*, been discontinued during the pendency of these motions), we grant State Mutual's cross-motion *to dismiss charges of pre-November, 1969, culpable involvement unless, within sixty days, plaintiffs file supplementary answering affidavits that appear to raise questions of fact on this score.*[7]

---

**6.** The foregoing argument applies equally to Yarvis. If the relevant facts are established in his case, all of his § 5 claims, even those arising after December 4, 1969, would be barred.

**7.** From a reading of the moving papers, it appears that plaintiffs' charge of aiding and abetting comes to this: that State Mutual merely stood by while Black Watch engaged in a course of culpable non-disclosure.

Under special circumstances, mere inaction may provide the basis for imposing secondary liability. See, e. g., *Brennan v. Midwestern United Life Insurance Company*, 286 F.Supp. 702 (N.D.Ind.1968), *aff'd*, 417 F.2d 147 (7th Cir. 1969), *cert. denied*, 397 U.S. 989, 90 S.Ct. 1122, 25 L.Ed.2d 397 (1970). The special circumstances warranting application of this rule have not been pleaded here. The supporting memo-

randa make passing reference to such circumstances, but the references are imprecise.

If plaintiffs are to succeed in prosecuting their claim that State Mutual aided and abetted Black Watch's violations of the federal securities laws, they must show that: either 1) State Mutual stood in a special relation to Black Watch's investors, one that imposed on State Mutual a duty to act positively in the face of Black Watch's claimed violations, *Landy v. FDIC*, 486 F.2d 139, 161–2 (3d Cir. 1975); *Fischer v. New York Stock Exchange*, 408 F.Supp. 745, 753 (S.D.N.Y.1976); or 2) State Mutual's "silence . . . was consciously intended to aid the securities laws violations." *SEC v. Coffey*, 493 F.2d 1304, 1317 (6th Cir. 1974).

**544**

Should plaintiffs file such affidavits, State Mutual may submit reply papers.

### C. Failure to Allege Damages in Connection With Late Transactions

Defendant State Mutual moves for summary judgment against Bickart and Yarvis on the grounds that they have failed to plead and prove damages in connection with their respective late transactions. It will be recalled that these transactions gave rise to claims of fraud. For the reasons stated below, we grant, in part, State Mutual's request for summary judgment.

We note at the outset that neither Bickart nor Yarvis has specified any damages. The contours of the damage claim become vaguely apparent only after close examination of plaintiffs' counsel's labrynthine briefs. Bickart claims that his late transactions—extension of his original promissory note, receipt of replacement animals, and maintenance payments (with calves as the currency)—resulted in "economic harm." He further alleges that had he been told the true state of Black Watch's affairs, he would have pulled out, and thereby avoided the losses that were consequent to bankruptcy. Yarvis' proximate damages are claimed to be the losses allegedly suffered as a result of the receipt of additional animals, which subjected him to increased maintenance costs, as well as replacement animals. A loss is also alleged to have been incurred by a maintenance payment, made in December, 1970. Like Bickart, Yarvis claims that he would have cut his losses had he been timely and properly informed of Black Watch's fragile prospects.

In short, each plaintiff alleges two sorts of damage, one the proximate result of specific transactions; the other, a highly speculative sort of consequential damage, which, as it turns out, cannot—as a matter of law—be compensated.

█ A buyer's recovery for a fraudulent securities transaction is limited to his or her out-of-pocket loss. The duped buyer is entitled to the "excess of what he paid over the value of what he got . . . ." *Levine v. Seilon, Inc.,* 439 F.2d 328, 334 (2d Cir. 1971);

*accord, Fershtman v. Schectman,* 450 F.2d 1357, 1361 (2d Cir. 1971), *cert. denied,* 405 U.S. 1066, 92 S.Ct. 1500, 31 L.Ed.2d 796 (1972). With this principle in mind, we examine the particular late transactions.

█ Bickart's note extension, which he apparently initiated, worked to his benefit. As a result of the extension, he gained continued use of his own capital resources and ultimately paid $8,000. less on his promissory note than he would have had the time for payment not been extended (Exs. 119, 125, 138, Bickart Deposition). Manifestly, the note extension caused no economic harm. Insofar as State Mutual seeks summary judgment dismissing the claim of fraud arising out of that transaction, judgment is granted. The only damages cognizable under the federal securities laws are those claimed in connection with Bickart's receipt of replacement animals and in-kind maintenance payments. With respect to these transactions, Bickart's allowable damage claims are: 1) that the replacement animals were inferior to the animals that were replaced and 2) that the maintenance services he received were less valuable than the cattle he delivered therefore.

Like Bickart, Yarvis' allowable damages are limited. With respect to his alleged replacement transactions, recovery may not exceed the difference between the value of the replacement animals that he received and the value of those that were replaced. To the extent that Yarvis claims "economic harm" in relation to the December, 1969 maintenance payment, his recovery is limited to the difference between value given and services rendered.

Yarvis also complains that free calves, received pursuant to the promised 90% calf crop, were the source of a federally cognizable economic injury. "The most important damage element in these 'free' cattle were [sic] their lulling effect which kept Yarvis paying from late 1969 onward." (Reply Brief at 66–7) This amounts to an assertion that but for the receipt of the animals, Yarvis would have minimized the losses he ultimately experienced: he would have

withdrawn his investment in Black Watch before it filed its bankruptcy petition. This claim is of the same stripe as the broader claim, lodged by both Bickart and Yarvis, that if they had only known the facts, they would have sold out and avoided the losses they suffered when Black Watch collapsed in September, 1970.

 This claim must be dismissed. Reliance on *Zeller v. Bogue*, 476 F.2d 795 (2d Cir. 1973), *cert. denied*, 414 U.S. 908, 94 S.Ct. 217, 38 L.Ed.2d 146 (1973) is misplaced.[8] The limited right to recover consequential damages, does not suspend the general rule that damages for the mere retention—as opposed to purchase or sale—of securities cannot be recovered in a Rule 10b–5 action. *Birnbaum v. Newport Steel*, 193 F.2d 461 (2d Cir. 1952), *cert. denied*, 343 U.S. 956, 72 S.Ct. 1051, 96 L.Ed. 1356 (1952); *accord, Blue Chip Stamps v. Manor Drug Store*, 421 U.S. 723, 95 S.Ct. 1917, 44 L.Ed.2d 539 (1975), *rehearing denied*, 423 U.S. 884, 96 S.Ct. 157, 46 L.Ed.2d 114 (1975). Restating the *Birnbaum-Blue Chip* rule: when fraud results merely in the retention of securities, no relief may be had under 10b–5.[9] This proscription applies regardless of the nature of the retention-inducing fraud. It is clear that had retention of plaintiffs' underlying investment been induced by a fraud involving nothing more than garden variety misrepresentation, damages consequent to that retention would be unavailable. This result is no different where, as here, retention of the investment was induced by a fraud that was perpetrated not by means of misrepresentation, but by the sale of discrete securities ("lulling modifications"), which were distinct from the investment that was retained.

## III.

### *Plaintiffs' Motion Against Andersen*

Plaintiffs move for summary judgment against Andersen for violations of Rule 10b–5,[10] based on Andersen's alleged failure to disclose Black Watch's adverse financial situation during the period 1968–70, when it acted as Black Watch's independent public accountant. In the apparent confidence that their claim against Andersen is so patently meritorious as to be a securities law analogue to the doctrine of *res ipsa loquitur*, they rest their case on the memoranda of counsel setting forth their argument and legal theory, supplemented with occasional references to the voluminous documentary exhibits annexed to the plaintiffs' moving affidavits.[11] At best the presentation reflects an extraordinary naivete with respect to both the matters which must be proved to establish an accountant's liability for 10b–5 violations and the possibility of achieving this end on a motion for summary judgment. In short, there are numerous issues of fact which require that the motions be denied. Moreover, a substantial portion of plaintiffs' argument is grounded on a basic misapprehension of the nature and scope of an independent accountant's

---

**8.** *Zeller* involved a claim that an underlying fraudulent act disrupted what would otherwise have been a successful public offering by the defrauded company. The court ruled that damages for the aborted offering could, as a theoretical matter, be had, but only if "the causal nexus" were established "with a good deal of certainty." (at 803) There is not the slightest suggestion in *Zeller* that plaintiffs may recover damages caused by retention merely by denominating the retention as a "consequence."

**9.** There are exceptions to the *Birnbaum* proscription, mentioned in our earlier opinion, *Ingenito v. Bermec Corporation, supra*, 376 F.Supp. at 1174–78, that have survived *Manor Drug Store*. They are not applicable here, for reasons discussed in the earlier opinion, *Ingeni-*to v. *Bermec Corporation, supra*, 376 F.Supp. at 1174–1177.

**10.** At the outset of their Amended Brief plaintiffs declare that they seek summary judgment against Andersen only on alleged 10b–5 violations, except with respect to a claim by Ingenito for violation of § 5(b)(2) of the '33 Act. (Amended Brief 2–3; 136) Since the motion of Ingenito must be denied in its entirety, see note 13, *infra*, we confine ourselves to a discussion of the 10b–5 claims.

**11.** The affidavits themselves, having been submitted almost two years before Andersen was added as a target of the summary judgment motion upon its renewal, have little bearing on this aspect of the motion.

duties with respect to the use of financial statements in the sale of securities.

Andersen first became involved with Black Watch in mid-1968 when Bermec, for whom Andersen performed auditing and accounting services, acquired Jack Dick's interest in Black Watch. (¶¶ 3–6, Hickman Affidavit) It performed an audit of Black Watch for the fiscal year ending June 30, 1968. (¶ 7, Hickman Affidavit) These figures were certified on September 11, 1968 and were incorporated, along with unaudited figures for the six month period July 1—December 31, 1968, in the Black Watch prospectus and registration statement of March 20, 1969 [12] and the amendment thereto which became effective May 26, 1969. (This is the May Prospectus).

A second audit of Black Watch for the year ending June 30, 1969 was completed in the Fall and certified on October 24, 1969. This report showed a drop in new herd sales from $12,339,000. in the first half of the fiscal year, July 1—December 31, 1968, to $8,224,000. in the second half, January 1—June 30, 1969. The significance of these figures is in sharp dispute. However, the trend worsened. In the three months ending September 30, 1969 Black Watch's unaudited figures showed new herd sales of only $1,600,000. Andersen recognized that Black Watch had a substantial problem, since new herd sales represented the company's principal source of cash flow. Accordingly, Andersen rendered its October 24th certification on the results of the '69 audit subject to a broad qualification, expressing its inability, because of the serious cash flow and liquidity problem caused by the drop in herd sales, to form an opinion as to the adequacy of a $6½ million reserve for possible losses.

The results of this audit were included in a proposed updated registration statement submitted to the SEC on November 26, 1969

in support of Black Watch's efforts to renew the registration for the sale of managed herds. (The May Prospectus was to expire on December 19, 1969.) However, the SEC refused to permit the superseding registration to become effective without substantial amendments. (See SEC Letter of Comment to Freed, Ex. 15, Hickman Affidavit, hereinafter "Letter of Comment".) The agency's concern stemmed in part from the breadth of the qualification of Andersen's opinion, and it solicited additional explanation of the reasons for the qualification in order to determine whether the financial statement properly could be considered "certified" as required by law. (Letter of Comment at 3)

Black Watch subsequently abandoned its attempt to comply with the SEC's requirements. Instead, it discontinued sale of new herds in late 1969. (Ex. 9d, Hickman Affidavit) The results of the 1969 audit appeared again on Black Watch's Form 10–K, which was filed with the SEC in February, 1970.

Plaintiffs' claims against Andersen fall broadly into three categories: misrepresentations and omissions in the financial picture portrayed in the May Prospectus; failure to provide information in the Fall of 1969 with regard to Black Watch's deteriorated condition; and failure to withhold entirely its certification of the '69 financials.

### A. The May Prospectus

■ Ingenito, who claims to have purchased his herds in December, 1969, and Bickart, who bought in June of that year, were shown the May Prospectus prior to investing. They allege that the financial information contained in this prospectus was false and misleading in three material respects: 1) the prospectus failed to reflect a major decline in herd sales from Decem-

---

**12.** By letter dated January 3, 1969, in response to the new managements' request for a "no-action letter," the SEC took the position that a Black Watch herd was a security requiring registration under the '33 Act. Black Watch suspended its sale of herds and filed a registration statement which became effective March

20, 1968. No herds were sold from January 7, when Black Watch received the SEC letter to March 20, when the first registration and prospectus became effective. (¶ 44, Yarvis Affidavit; ¶ 23, Katz Class Action Affidavit; *Ingenito v. Bermec Corporation, supra,* 376 F.Supp. at 1163.)

ber 31, 1968 to May, 1969; 2) it failed to disclose substantial defalcations by Dick prior to Bermec's acquisition of Black Watch in July, 1968; and 3) it failed to disclose that, contrary to generally accepted accounting principles, earnings and revenues reported in the certified financial statement for fiscal '68 were in substantial part comprised of receivables of doubtful collectability. An extended discussion of the factual background of these contentions would serve no purpose. It will suffice to outline the most significant material factual disputes with respect to each of these claims.[13]

### 1. The Sales Decline

During the period January 7—March 20, 1969 herd sales were suspended pending effectuation of the registration statements. See note 12, supra. Plaintiffs speculate that the decline in sales from the first half of fiscal '69 to the second half (reflected on the audited statement for fiscal '69 certified on October 24) was the beginning of Black Watch's serious liquidity problem which ultimately contributed significantly to its demise. They criticize the May, 1969 prospectus for failure to point out this drop in sales and the fact that Black Watch "was already experiencing serious cash flow problems as a result." (Amended Brief at 82).

To begin with, there is no clear showing that the Company's "serious cash flow problems" did begin in this six month period.[14] In support of this contention plaintiffs point to Note 10 of the '69 financials. This note refers to the decline in sales through and including the three month period ending September 30, 1969 and states that the company's "inability to consummate herd sales has seriously impaired its cash flow." (Ex. 6, Note 10, Yarvis Affidavit, supra) The reference is to a liquidity problem existing on October 24, the date of the report.

There is nothing to support plaintiffs' inference that as of May, 1969, such a characterization of the company's situation would have been appropriate. Indeed, Andersen plausibly contends that it reasonably agreed with Black Watch management in May, 1969 that the suspension of sales from January to March (see note 12, supra) would not jeopardize the company's future. (See ¶¶ 22–24, 44, Hickman Affidavit, supra, and Memorandum in Opposition at 83–86) It points out that despite the long sales hiatus, sales in the six month period ending June 30, 1969 amounted to $8,224,000, a fact which lends weight to the reasonableness of their judgment. The fact that the May Prospectus clearly disclosed the cessation of sales on January 7th, pending registration, raises further questions with respect to the materiality of the omitted matter. Finally, it is patent that all of the foregoing raises a substantial question as to proof of scienter, even assuming the materiality of the alleged omissions. See Ernst & Ernst v. Hochfelder, 425 U.S. 185, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976).

### 2. Dick's Fraud

Andersen does not dispute that in April, 1969 it learned that Bermec had asserted claims against Dick for breach of numerous warranties he had given in connection with the sale of Black Watch Farms, including a claim that Dick had converted some $3,000,-000. (¶¶ 45–46, Hickman Affidavit, supra) It vigorously contends, however, that in view of the time which had passed since the alleged defalcations (i. e. over a year), the assertedly satisfactory nature of the settlement with Bermec, and the assertedly negligible effect of the entire matter on Black Watch's financial condition both as of June 30, 1968, the final date of the audit period, and May, 1969, when the report was released in the prospectus, there was no ne-

---

**13.** The discussion which follows applies only to Bickart's motion. Ingenito's motion must be denied for the simple reason that Andersen has not been made a defendant in this action. A motion to amend to add Andersen has been made and will be granted. The factual issues

which preclude summary judgment, discussed above, remain.

**14.** In Yarvis' own affidavit, adopted in substance by Bickart, Cear and Ingenito, he refers to a "serious cash crisis starting in the summer of 1969." (¶ 4, Yarvis Class Action Affidavit.)

cessity to restate the balance sheet for fiscal '68. (See ¶¶ 45–52 Hickman Affidavit, *supra;* Memorandum in Opposition at 86–90) Whatever the ultimate merits of these contentions, issues of fact are apparent, again, with respect to both materiality and *scienter.*

### 3. Accounting Treatment of Herdowner Receivables

Finally, plaintiffs contend that they are entitled to summary judgment based on Andersen's treatment of herdowner receivables in the financial statement for fiscal '68. Yet they have not submitted even a single affidavit from a professional accountant in support of the proposition that this treatment was unjustified and, as with their presentation on the matters discussed above, their papers fail to make out a case for summary judgment. Moreover, Andersen vigorously defends its accounting practice on the '68 audit. It contends that its treatment of the receivables is fully in accord with generally accepted accounting principles and was amply justified under the circumstances. Among other things, it challenges plaintiffs' assertion that the receivables were of dubious collectability and seriously undermines plaintiffs' argument that Andersen itself recommended a different accounting treatment to Black Watch because it recognized the impropriety of the method used. (See ¶¶ 53–63, Hickman Affidavit, *supra;* Memorandum in Opposition at 90–99) On this aspect of their claim, in addition to the proposition of materiality and *scienter* thus raised, plaintiffs will also have to prove reliance. *Herzfeld v. Laventhol, Krekstein, Horwath & Horwath,* 378 F.Supp. 112, 127 (S.D.N.Y.1974), *aff'd in part, rev'd in part on other grounds,* 540 F.2d 27 (2d Cir. 1976). It is clearly impossible to resolve such issues without a full trial.

### B. Andersen's Alleged Failure to Update

The moving plaintiffs claim never to have seen the results of Andersen's audit for fiscal '69.[15] Yet they seek summary judgment against Andersen for its failure to insure that the contents of this audit were disseminated to them. They claim that Andersen is liable for failure after October 24, 1969, to demand that Black Watch "make full disclosure in its circulating Prospectus [i. e. the May Prospectus] of the downturn in sales and earnings through September, 1969, the cash flow problems and the possibility of liquidation at significant losses." (Amended Brief at 58) They take the position that because Andersen knew of the continued use of the May Prospectus and knew further that the financial picture it portrayed no longer reflected the true state of affairs, Andersen owed a duty under established case law and prevailing professional standards to see that the figures in the May Prospectus were "updated," [by which they appear to mean supplemented with the results of the '69 audit,] or that the truth was somehow disseminated to the public. "Permitting such outdated material to circulate for so long a period sums up Andersen's breach of duty." (Amended Brief at 54)

In support of this argument plaintiffs rely primarily on *Securities and Exchange Comm. v. Manor Nursing Centers, Inc.,* 458 F.2d 1082 (2d Cir. 1972) and *Gould v. American Hawaiian Steamship Co.,* 351 F.Supp. 853 (D.Del.1972). Neither case is apposite. *Securities and Exchange Comm. v. Manor Nursing Centers, Inc.,* holds that *sellers* of securities must inform investors of developments subsequent to the effective date of a registration which render statements contained in the prospectus materially false and misleading. Although the case thus imposes a duty of continuous disclosure on the seller of securities, it says nothing with respect to the obligation of an independent public accountant in this regard. Plaintiffs' contention that the holding of the case "necessarily applies to every professional connected with a prospectus," (Reply Brief at 40), is entirely at odds with the cases

---

**15.** But see 541, *supra.*

dealing with accountants' liabilities.[16] Not a single case cited in plaintiffs' extensive briefs on this point can reasonably be read to support their argument.

■■■ The task of an independent public accountant is fairly to report a company's financial status at a particular time.[17] It is by now basic that when an accountant certifies a financial statement it represents to those who see the statement that the figures are accurate in all material respects; a relationship is thus created between the accountant and those who see the statement which gives rise to certain duties of disclosure. See *Gold v. DCL Corp.,* 399 F.Supp. 1123, 1127 (S.D.N.Y.1973). On the basis of this representation, the accountant may be held liable under Rule 10b–5 for the preparation of false or misleading financial statements which portray an inaccurate picture for the period covered by the report. See, e. g., *Herzfeld v. Laventhol, Krekstein, Horwath & Horwath, supra,* 540 F.2d 27 (2d Cir. 1976). In connection with a registration statement, an accountant is under an additional obligation to conduct a reasonable inquiry, but not an audit, to discover whether events subsequent to the audit period up to the effective date of the registration require disclosure in order to maintain the integrity of the portrayal. *Escott v. Barchris Constr. Corp.,* 283 F.Supp. 643, 697–703 (S.D.N.Y.1968).[18] Where financial statements have been certified and released to the public, courts have imposed a continuous duty to disclose after-acquired information which casts doubt on the reliability of the certified figures *with respect to the period covered by the audit.* See, e. g., *Hirsch v. du Pont,* 553 F.2d 750, 761 (2d Cir.

1977); *United States v. Natelli,* 527 F.2d 311 (2d Cir. 1975), *cert. denied,* 425 U.S. 934, 96 S.Ct. 1663, 48 L.Ed.2d 175 (1976); *Fischer v. Kletz,* 266 F.Supp. 180, 189–94 (S.D.N.Y.1967).

■■■ Plaintiffs' argument on this branch of their motion brings none of these principles into play. Rather, they seek to impose on Andersen a continuing duty to keep investors apprised of adverse developments long after the date of the certified report. There is no basis for such a claim. The mere possession of adverse financial information regarding a public company does not require an independent auditor to disclose it. *Wessel v. Buhler,* 437 F.2d 279 (9th Cir. 1971); *Gold v. DCL Corp., supra,* 399 F.Supp. at 1127; *Fischer v. Kletz, supra,* 266 F.Supp. at 194–96. This remains true even if the auditor previously has certified figures for a prior period, so long as the certified statement is still accurate as of the date of its issuance. See *Hirsch v. du Pont, supra,* 553 F.2d at 761.

Yarvis, who saw neither the '69 financials nor the May Prospectus containing the figures for the prior year, contends that Andersen owed him a duty to insure that he was provided with a copy of the May Prospectus as well. This claim is based on equally chimerical grounds. His theory appears to be that Andersen "aided and abetted" Black Watch's "conscious determination" to withhold this data from the pre-prospectus purchasers. (Amended Brief at 108–09) In particular, Yarvis complains that had he seen the prospectus, he would have learned of his right to rescind, which was discussed in Note 10 of the document.[19]

---

**16.** The relevance of *Gould v. American Hawaiian Steamship Co.* is even more dubious. That case involved the liability of issuers and their officers and directors for false and misleading material in a corporate proxy statement in violation of § 14(a) of the '34 Act, 15 U.S.C. § 78n(a). The court expressly stated that attorneys and accountants are excluded from the statutory liability there imposed on the defendants. 351 F.Supp. at 865.

**17.** See *State Street Trust Co. v. Ernst,* 278 N.Y. 104, 113, 15 N.E.2d 416, 419 (1938) ("[The auditor's] business is to ascertain and state the true

financial position of the company at the time of the audit, and his duty is confined to that.")

**18.** Andersen acknowledges a similar responsibility, pursuant to current professional standards, in connection with all certified audits to inquire with respect to events between the final audit date and the date of certification.

**19.** Apart from Note 10, Yarvis claims that the '68 financial statement was, like the audit a year later, a "house of cards." (Amended Brief at 118) Taking him at his word, it is difficult to

We have already held, however, that there can be no claim under 10b–5 for failure to disclose a right of rescision. See *supra* at 532. There is, consequently, no underlying 10b–5 fraud on Black Watch's part for Andersen to have aided or abetted. Moreover, to the extent this claim might encompass other, unarticulated aspects of the May prospectus which Yarvis was harmed by his failure to see, he cites no authority whatsoever which supports his theory that accountants have a continuing duty to insure that all possibly interested persons are provided with financial statements which they prepare.[20] And we know of none.[21]

## C. Andersen's Failure to Refuse Certification

█ As an alternative to their contention that Andersen owed a duty to "update" the financial data in the May Prospectus in the Fall of that year, plaintiffs contend that Andersen is liable for not refusing to certify the '69 figures altogether, an act they say would inevitably have precipitated the earlier demise of the Black Watch operation. The argument runs that had Andersen done so this would have precipitated the earlier demise of the Black Watch operation; and had Black Watch died sooner, late transactions occurring after that time would not have occurred.

Plaintiffs' argument amounts to an assertion that by failing to refuse certification, Andersen aided and abetted Black Watch's ongoing fraud, by aiding and abetting Black Watch's existence. They contend that if Andersen had withheld certification, the SEC would inevitably have been more concerned than it was and stepped in to terminate Black Watch's securities transactions. Thus, Andersen is charged with having rendered substantial assistance to the fraud. By issuing its qualified certification, instead of no certification at all, it enabled the business to stave off disaster for a longer period.

Although we cannot agree with Andersen that this claim is legally insufficient summary judgment for the plaintiffs is manifestly out of the question. Each element of the claim is the subject of heated dispute. In order to prevail plaintiffs will have to show that Andersen knew of the fraud, intended to further it and actually rendered substantial assistance by deliberately qualifiedly certifying the '69 financials instead of refusing certification altogether. See *Rosen v. Dick, supra* [1974–75] C.C.H.Fed. Sec.L.Rep. ¶ 94,786 at 96,604. Entirely apart from the questions of Andersen's knowledge of the fraud and intent to fur-

understand his theory of damages for failure to provide him with this misleading data.

**20.** Typical of the citations in the brief on this point are *Matter of Drayer-Hanson, Inc.,* 5 C.C. H.Fed.Sec.L.Rep. ¶ 77,083 (1947) and *Securities and Exchange Comm. v. North American Research R & D Corp.,* 424 F.2d 63 (2d Cir. 1970). Neither case has anything to do with an accountant's purported obligation to require an issuer to distribute financial information to interested persons. The former is an SEC Release reporting an incident in which an issuer and its accountant jointly notified the SEC of their discovery, in 1947, of facts which rendered the certified financials for the prior year inaccurate. Since the company volunteered to disseminate correcting information, the SEC determined that a stop order proceeding would be unnecessary. In *Securities and Exchange Comm. v. North American Research R & D Corp.,* the issuing corporation, its controlling shareholders and chairman of the board were enjoined from future violations of the securities laws based on their sale of securities under an

inadequate prospectus. The prospectus contained no financial statements, because the audit had not been completed at the time it was released. In a footnote, the court observed that when the financials finally were completed, the accounting firm disclaimed an opinion as to their reliability. It did not even suggest, however, that the firm had a duty to see that this data was distributed to all who saw the misleading prospectus. 424 F.2d at 77 n. 12.

**21.** A variation on this theory of liability, developed for the first time in response to Andersen's cross-motion, is that Yarvis has a 10b–5 claim against Andersen for aiding and abetting Black Watch's fraud based on the financial data in the May Prospectus. This theory is not premised on Andersen's asserted duty of disclosure to Yarvis, however, but on the theory that by falsifying the financial data, Andersen substantially assisted Black Watch's fraud by enabling it to continue longer than it otherwise would have been able to do. This claim is at least theoretically viable. See *infra* at 551–552.

ther its ends, the question whether it substantially assisted the fraud by issuing a qualified opinion raises a host of factual issues. A sample of the questions which spring immediately to mind is whether the qualified opinion, itself an important cause of the SEC's refusal to permit the updated registration to take effect, can in any way be considered to have *helped* Black Watch; whether, if Andersen really intended to further the fraud, it would have qualified the opinion it did give; and whether there is any reason to believe that an outright refusal to certify would have brought about an earlier end to Black Watch's affairs.[22]

Moreover, it must be emphasized that the only damages available on this theory are those arising from specific late transactions that occurred after the time that, but for Andersen's complicity, Black Watch would have gone out of existence. There can be no recovery on the claim that plaintiffs failed to exercise their right to rescind because of this aiding and abetting. Such a result would violate the rule of *Blue Chip Stamps v. Manor Drug Store, supra,* 421 U.S. 723, 95 S.Ct. 1917, 44 L.Ed.2d 539. See 545 *supra.*

### IV.

*Andersen's Cross-Motion for Partial Summary Judgment*

Andersen cross-moves for partial summary judgment on two grounds. It contends that Yarvis' claims against it should be dismissed in their entirety because they are based on a legally insufficient theory of liability. And it further asserts that the '33 Act claims of both Yarvis and Bickart are time-barred.

#### A. Yarvis' Claims

For the reason articulated in the foregoing section, we agree that substantial portions of Yarvis' claims against Andersen are without any basis in law. To the extent

that he asserts claims for Andersen's alleged failure to insure that he received a copy of the May Prospectus and for failure, after October, 1969 to disseminate "updated" information, Andersen is entitled to summary judgment. He has provided no authority which supports his right to recover for these alleged transgressions.

 However, we cannot at this stage of the proceedings dismiss the claim asserted by Yarvis, as well as Bickart, that Andersen aided and abetted Black Watch's fraud by not withholding its certification of the '69 financials in the Fall of that year. Moreover, in his response to Andersen's cross-motion Yarvis asserts a similar claim relating to the May prospectus which could conceivably provide a basis for recovery. He argues that, "If [Andersen] had done [its] statutory duty, the Black Watch offering would have ended in mid-1969. . . . Merely disclosing Dick's embezzlement and fraudulent financials in the [May] prospectus would have brought the Black Watch juggernaut to a halt in the summer of 1968." (Reply Brief at 17–18) Yarvis appears to be arguing that Andersen aided and abetted Black Watch's fraud insofar as its material omissions and misrepresentations in the '68 financials provided substantial assistance to the on-going fraud by prolonging it. However difficult such a claim may be to prove, Yarvis is entitled at this stage of the proceedings to assert it. In order to prevail on such a theory, however, Yarvis will have to establish that Andersen knew of the fraud, intended to further it and gave substantial assistance to it by means of its sins of omission and commission in the May Prospectus. See *Rosen v. Dick, supra* [1974–75] C.C.H.Fed.Sec.L. Rep. ¶ 94,786 at 96,604. Among other things, Yarvis will have to prove not only that the financial data in the May Prospectus was actionably defective, which is hotly contested, but that had it contained the

---

**22.** We note in this regard that plaintiffs' factual argument for summary judgment on this aspect of their claim rests on a distorted reading of the SEC Letter of Comment to Freed. For the reasons articulated in Andersen's Answer-

ing Brief at 29–35, this letter, on its face, can in no way fairly be characterized as an "instruction" to Andersen to "disclose and withhold certification." (Amended Brief at 65)

disclosures he asserts is should have, the Black Watch offering would indeed have been earlier terminated. Again, if proved, this claim is sufficient only to recover damages for particular transactions after the date at which it is determined that the "Black Watch juggernaut" would otherwise have come to an end.

### B. The '33 Act Claims

Andersen moves for summary judgment on all claims asserted by Yarvis and Bickart pursuant to the Securities Act of 1933 on the grounds that these claims are time-barred. It will be recalled that Yarvis commenced his action on December 4, 1970, while Bickart did so on December 22, 1970. Andersen, however, was not added as a defendant in either action until February 14, 1972.

Section 13 of the '33 Act, 15 U.S.C. § 77m states, in relevant part, that: [23]

"No action shall be maintained to enforce any liability created under section 77k or 77l(2) of this title unless brought within one year after the discovery of the untrue statement or the omission, or after such discovery should have been made by the exercise of reasonable diligence, or, if the action is to enforce a liability created under section 77l(1) of this title, unless brought within one year after the violation upon which it is based."

As is plain from the statutory language, claims under § 12(1), 15 U.S.C. § 77l(1) require separate discussion from those raised under §§ 11 or 12(2), 15 U.S.C. §§ 77k or 77l(2).

■■■ Before dealing with the merits of Andersen's motion, we note that all of plaintiffs' '33 Act claims against Andersen are subject to dismissal for failure to plead compliance with the statute of limitations, as we earlier ruled at 376 F.Supp. at 1165, 1173. To the limited extent that these claims otherwise survive Andersen's motion for summary judgment, they will be dismissed unless this defect is corrected within twenty days.

### 1. The Section 12(1) Claim

Both Bickart and Yarvis purport to assert claims against Andersen based on § 12(1).[24] By the express language of § 13, these claims are barred unless asserted "within one year after the violation upon which [they are] based." Andersen argues that the last conceivable date that any violation could have occurred is September 4, 1970, the date of Black Watch's bankruptcy, and therefore, that the claims asserted against it in February, 1972 are untimely. We agree.

■■■■ Yarvis and Bickart attempt to take advantage of the relation back provisions of Fed.R.Civ.Pr. 15(c)[25] and thereby to benefit from the 1970 filing dates of the original actions against the other defendants. Rule 15(c), however, has no application here for at least two reasons. First, it

---

**23.** Andersen's argument is not directed at the three year limit contained in the second sentence of § 13. But see discussion of State Mutual's motion at 542–543, *supra*.

**24.** We are so informed by counsel's memorandum in opposition to this motion; it is not at all clear from the pleadings. Yarvis' claim, we are told, is based on Andersen's failure to deliver a prospectus through the period ending in Black Watch's bankruptcy on September 4, 1970, in violation of § 5(b)(1). Bickart's claim rests on his contention that Andersen aided and abetted Black Watch's failure to deliver an up-to-date prospectus, in violation of § 5(b)(2). (Reply Brief at 9)

**25.** In pertinent part, the rule reads as follows: "(c) . . . Whenever the claim or defense asserted in the amended pleading arose out of the conduct, transaction, or occurrence set forth or attempted to be set forth in the original pleading, the amendment relates back to the date of the original pleading. An amendment changing the party against whom a claim is asserted relates back if the foregoing provision is satisfied and, within the period provided by law for commencing the action against him, the party to be brought in by amendment (1) has received such notice of the institution of the action that he will not be prejudiced in maintaining his defense on the merits, and (2) knew or should have known that, but for a mistake concerning the identity of the proper party, the action would have been brought against him . . . ."

does not apply to the addition of a new party defendant after the limitations period has run. Such an amendment is tantamount to the assertion of a new cause of action, and to permit relation back under these circumstances would be to subvert the policies of the statute of limitations. *Simmons v. Fenton,* 480 F.2d 133, 137 (7th Cir. 1973); *Graves v. General Insurance Corp.,* 412 F.2d 583, 585 (10th Cir. 1969). See 3 Moore, Federal Practice ¶ 15.15[4.–11] at 1041–47 (2d ed. 1974) and cases cited there. An exception to this rule where there is an identity of interest between the new and the old defendants such that relation back would not be prejudicial, see *Graves v. General Insurance Corp., supra,* has no application here, where no such claim could conceivably be made. Second, under Rule 15(c) no amendment adding a defendant may relate back unless, in addition to having the requisite identity of interest with the original defendant, the new party

"within the period provided by law for commencing the action against him . . (2) knew or should have known that, but for a mistake concerning the identity of the proper party, the action would have been brought against him."

Plaintiffs have conceded, however, that they had no intention of suing Andersen at

the outset of this litigation, and, indeed, that they did not think of doing so until State Mutual filed its action against Andersen in September, 1971. (Brief in Opposition at 9) It can hardly be said that Andersen should have known of a mistaken identity, if no such mistake existed.

 In support of their effort to retain the § 12(1) claims in the case against Andersen, plaintiffs briefly advert to the "equitable tolling doctrine" as applied in *Moses v. Michael,* 292 F.2d 614 (5th Cir. 1961). Although that case has nothing to do with the doctrine of equitable tolling, the doctrine has been held applicable to § 12(1) actions. *Katz v. Amos Treat & Co.,* 411 F.2d 1046, 1055 (2d Cir. 1969); *Houlihan v. Anderson-Stokes, Inc.,* 434 F.Supp. 1319 (D.D.C.1977). However, plaintiffs suggest no facts that would bring this doctrine into play.[26]

## 2. The Section 11 and 12(2) Claims

This aspect of Andersen's motion is directed only at Bickart.[27] His § 11 and § 12(2) claims are required to have been brought "within one year after the discovery of the untrue statement or omission, or after such discovery should have been made in the exercise of reasonable diligence." 15 U.S.C. § 77m, *supra.* Andersen

---

**26.** Plaintiffs' frequent references to the doctrine of equitable tolling and persistent citation of cases which have nothing to do with it suggest that counsel is laboring under a misconception with regard to the meaning of the phrase. It is not a general term of reference for any one of a variety of situations in which limitations periods are relaxed. Rather, it is an uncomplicated, but rather limited doctrine, which tolls the statute of limitations with regard to federally created causes of action sounding in fraud or federally created causes of action which have been fraudulently concealed, until the fraud or the concealment is, or in the exercise of reasonable diligence *should have* been, discovered. See *Holmberg v. Armbrecht,* 327 U.S. 392, 66 S.Ct. 582, 90 L.Ed. 743 (1946); *Bailey v. Glover,* 21 Wall. (88 U.S.) 342, 22 L.Ed. 636 (1875). Judge Gineaux has provided an excellent resume of the doctrine in *Dyer v. Eastern Trust and Banking Co.,* 336 F.Supp. 890, 901 (D.Me.1971).

Since actions under § 12(1) are not themselves in the nature of fraud, plaintiffs must point to action by Andersen which fraudulently

concealed their claim in order to take advantage of equitable tolling. This they have not done even in their memorandum in opposition to this motion, much less by affidavit as required by Rule 56(e). Indeed, plaintiffs who wish to toll the statute are required to make "distinct averment [in their pleadings] as to the time when the fraud, mistake, concealment or misrepresentation was discovered, and what the discovery is, so that the court may clearly see whether by the exercise of ordinary diligence the discovery might not have been before made." *Stearns v. Page,* 7 How. (48 U.S.) 819, 829, 12 L.Ed. 928 (1849), quoted and followed in *Moviecolor Ltd. v. Eastman Kodak Co.,* 288 F.2d 80 (2d Cir. 1961). Needless to say, no such averments appear in the pleadings in this case.

**27.** Although Ingenito has not yet made Andersen a defendant in his action, he has moved to do so and we have agreed to permit it. The result reached above, however, would apply as well to any § 11 or § 12(2) claims he might wish to assert when he does amend.

contends that the knowledge reflected in Bickart's original complaint verified on December 22, 1970, is sufficient to support a finding that the one year period began to run on that date with respect to claims against Andersen. An examination of Bickart's earliest pleading demonstrates conclusively that as of that date he was at least on inquiry notice of two of the three claims he finally asserted against Andersen some fourteen months later.

It will be recalled that Bickart's contention against Andersen is that the financial picture portrayed in the May, 1969 prospectus was misleading in three respects: 1) it failed to disclose a sharp decline in herd sales from December 31, 1968 to May, 1969; (2) it failed adequately to disclose the use of receivables in computing current earnings; and 3) it failed to disclose Dick's fraud on Black Watch a year earlier. The essence of the first two of these claims is spelled out in some detail, albeit against the other defendants, in Bickart's December, 1970 complaint. Paragraph 19 states, in part:

"By mid–1969, Black Watch was already in a deteriorating financial position, its cash flow was inadequate to service its debt and herd maintenance obligations, and it became, in substance, a pawn of its creditors, selling securities primarily to satisfy their loans with cash and collateral in the form of defrauded investors' notes."

Paragraph 20(a) goes on to quote Note 10 of the '69 financial statement which describes the particulars of Black Watch's serious cash crisis due to the sharp drop in herd sales. This note provides the data on which Bickart now places principal reliance in his case against Andersen. (See, e. g., Reply Brief at 16, 39–40, 76–77).

Paragraph 12 of Bickart's first complaint adverts to the misleading use of herdowner receivables on the prospectus:

"12. The Prospectus misleads potential investors into thinking that Black Watch's commitment to maintain the herds was dependable by displaying Black Watch as a viable and strong economic entity. The Prospectus exaggerates

Black Watch's income without indicating the conditional nature of that income, saying:

'The Company's gross revenues for the year ended June 30, 1968 and the six months ended December 31, 1968 (unaudited were $19,120,753 and $17,500,000, respectively, and its pre-tax net income for such periods. was $7,236,495 and $5,100,000, respectively.' (p. 4 Ex. A)

The Prospectus does not state that such revenue and income consists, for the most part, of notes receivable from purchasers of the investment contracts, who were anticipating continued performance of Black Watch's maintenance obligations on their herds, and that purchasers of investment contracts could not be expected to pay their notes owing, unless Black Watch honored its obligations to them. *Moreover, said exaggerated revenues and income do not state that they are based largely upon receivables, not cash, and are from hundreds of individual investors of varying financial responsibility.*" (Emphasis supplied).

Annexed as Exhibit A to the complaint is a copy of the May Prospectus. Page 17 of the document contains Andersen's certification of the '68 financial statement which appears in it.

 It is thus apparent that as early as December 20, 1970 Bickart not only believed the May Prospectus to have been deceptive in these two respects, but he knew as well of Andersen's involvement in the preparation of the figures which were the object of his claims. This, we believe, is enough to commence the running of the statutory period with respect to these two claims. It is of no moment that he may not have known as many of the details of his claim or of Andersen's involvement with Black Watch as he later acquired. The reasonable diligence standard requires a plaintiff to pursue his claim when "the possibility of fraud should have been apparent." *Klein v. Shields & Co.,* 470 F.2d 1344, 1347 (2d Cir. 1972). The period begins to run at the point at which a plaintiff has enough facts to be on inquiry notice of a

potential claim; it does not wait until he has full knowledge of the eventual particulars of his case. *Klein v. Bower,* 421 F.2d 338, 343 (2d Cir. 1970).[28] In our view, a reasonably prudent man in possession of the knowledge reflected in Bickart's December, 1970 complaint could certainly be expected to inquire into the possibility of Andersen's involvement in the fraud. Compare *Dack v. Shanman,* 227 F.Supp. 26, 28 (S.D.N.Y. 1964). Indeed, it is difficult to imagine how the possibility could have escaped attention.

Andersen argues that the same result should apply with respect to Bickart's claim that it failed to disclose the Dick fraud. It claims that a close reading of Note 7 of the '69 financials[29] would have alerted a reasonably diligent plaintiff to the facts underlying this claim. To this it adds that even more indication of the fraud could have been gleaned from the Form 10–K filed in February, 1970. Although a trier of fact might conclude that Andersen is correct in its characterization of Note 7, the alleged reference to the Dick Fraud is opaque. The relevance of the cited material in the Form 10–K is even more uncertain,[30] as is the question whether Bickart ever saw or should have seen this informa-

tion on or before he filed his complaint. Moreover, we cannot accept Andersen's alternative position that as a matter of law Black Watch's bankruptcy on September 4, 1970 put plaintiffs on notice of all subsequent claims. In sum, whether reasonable diligence would have led to the discovery of the facts underlying Bickart's allegation that Andersen covered up the Dick fraud is a question of fact. Accordingly, summary judgment with respect to this claim alone is denied. See *Schillner v. H. Vaughan & Co., supra,* note 28, 134 F.2d at 879.

For the foregoing reasons, Andersen's motion to dismiss Bickart's '33 Act claim based on its alleged failure to disclose the Dick fraud in the May Prospectus is denied. In all other respects, the motion to dismiss the '33 Act claims of Yarvis and Bickart is granted.

\*　　\*　　\*　　\*　　\*　　\*

In view of the foregoing, the motions and cross-motions are disposed of as follows:

I) The plaintiffs' motions for summary judgment are denied in all respects.

II) State Mutual's cross-motion for summary judgment is granted to the following extent and is denied in all other respects:

---

**28.** Although the court in *Klein v. Shields & Co., supra,* and *Klein v. Bower, supra,* was discussing a New York statute of limitations, N.Y.C.P. L.R. § 213 (McKinney 1972), the same standard applies under § 13. See *Rosenberg v. Hano,* 121 F.2d 818, 821–22 (3d Cir. 1941); *Johns Hopkins University v. W. E. Hutton & Co.,* 422 F.2d 1124, 1130–31 (4th Cir. 1970). Cf. *Schillner v. H. Vaughan & Co.,* 134 F.2d 875, 878–79 (2d Cir. 1943).

**29.** Note 7 reads as follows:

"In April 1969, the Company entered into several agreements with the former principal owner of B.W. Farms, Inc. providing for the immediate termination of his consulting contract and delivery by him of his 6½% promissory note for $4,500,000 in settlement for claims made with respect to certain representations and warranties relating to the Company's acquisition of substantially all the assets and certain liabilities of B.W. Farms, Inc. (See Note 1). As these agreements did not allocate the $4,500,000 to specific claims made under the various representations and warranties, the Company, with the concurrence of its Board of Directors, has made such allocation in its accounts, for the year ended June 30, 1969, based on a review of the

existing facts and circumstances, primarily as reimbursements for Black Watch Farm's recorded asset amounts which were in excess of replacement cost or net realizable value and liabilities and losses unrecorded as of the acquisition date."

**30.** Andersen relies on Schedule XII of this document, which sets out the allocation of the funds received from Dick in settlement of Bermec's claims respecting Black Watch accounts as follows:

| "Reduction of inventory of livestock to lower of cost or replacement value | $1,225,000 |
| Settlement of claims of herdowners | 1,658,000 |
| Loss on sale of horses and household furnishings | 523,000 |
| Accrued losses on joint ventures | 285,000 |
| Reserve for uncollectible receivables | 809,000 |
| | $4,500,000" |

a) The '33 Act claims of all plaintiffs are dismissed unless, within twenty days, each plaintiff affirmatively pleads compliance with the statute of limitations.

b) Yarvis' '33 Act claims are dismissed insofar as they arose from transactions occurring prior to December 4, 1969.

c) Bickart's '33 Act claims are dismissed insofar as they arose from transactions occurring prior to September 18, 1969.

d) The allegations of all plaintiffs that State Mutual was an underwriter or promoter are dismissed.

e) The allegations of all plaintiffs against State Mutual are dismissed insofar as they are predicated on State Mutual's attaining control person status prior to November 10, 1969. Allegations that prior to November 10, 1969, State Mutual participated in or aided and abetted the claimed fraudulent activities are dismissed unless, within sixty days, plaintiffs file supplementary affidavits that appear to raise questions of fact on this score.

f) Yarvis' and Bickart's claims for damages are dismissed insofar as they are predicated upon losses occasioned by the retention of securities.

III) Andersen's cross-motion for partial summary judgment is granted to the following extent and denied in all other respects:

a) The '33 Act claims of all the plaintiffs are dismissed unless, within twenty days, each plaintiff affirmatively pleads compliance with the statute of limitations.

b) The cross-motion to dismiss the '33 Act claims of Yarvis and Bickart is granted, except that the motion to dismiss that part of Bickart's '33 Act claim which is based on Andersen's alleged failure to disclose the Dick fraud in the May prospectus is denied.

It is so ordered.