## In re IKON OFFICE SOLUTIONS, INC. SECURITIES LITIGATION.

### No. 98–CV–4286.

United States District Court,
E.D. Pennsylvania.

Sept. 14, 1999.

Deborah R. Gross, Law Offices of Bernard M. Gross, P.C., Philadelphia, PA, Robert P. Frutkin, Savett, Frutkin, Podell and Ryan, P.C., Philadelphia, PA, Lynn Lincoln Sarko, Britt L. Tinglum, Keller, Rohrback, LLP, Seattle, WA, Jerome M. Congress, New York City, Douglas Risen, Berger & Montague, Philadelphia, PA, Patrick Slyne, Stull Stull & Brody, New York City, for Philip Cohen, Sandra Cohen, plaintiffs.

Todd S. Collins, Berger & Montague, P.C., Philadelphia, PA, Jules Brody, Aaron L. Brody, Stull Stull & Brody, New York City, Jared Specthrie, Samuel H. Rudman, Milberg, Weiss, Bershad, Hynes & Lerach, New York City, Robert P. Frutkin, Savett, Fruitkin, Podell and Ryan, P.C., Philadelphia, PA, Lynn Lincoln Sarko, Britt L. Tinglum, Juli E. Farris, Keller, Rohrback, Seattle, WA, Jerome M. Congress, New York City, Lee A. Weiss, Milberg, Weiss, Bershad, Hynes & Lerach, LLP., New York City, for Randy Leach, Judy Leach, Oliver Scofield, Dan Watson, Frederick L.

Goldfein, Stanley Kopp, Lawrence Porter, Gerard J. Galiger, plaintiffs.

Thomas B. Roberts, Ballard, Spahr, Andrews and Ingersoll, Philadelphia, PA, Rory O. Millson, Alan J. Hruska, Thomas G. Rafferty, Cravath, Swaine & Moore, New York City, John G. Harkins, Jr., Harkins Cunningham, Philadelphia, PA, Gerald A. Ford, Cravath, Swaine & Moore, New York City, Miriam Hechler Baer, Andrew G. Gordon, Cravath, Swaine & Moore, New York City, for Ikon Office Solutions, Inc., James J. Forese, defendants.

Lawrence T. Hoyle, Arlene Fickler, Michael T. Starczewski, Hoyle, Morris and Kerr, LLP, Philadelphia, PA, for John E. Stuart, defendant.

Jacob A. Goldberg, Berger and Montague, P.C., Philadelphia, PA, Lynn Lincoln Sarko, Keller Rohrback, Seattle, WA, for Philadelphia Group, movant.

Thomas B. Roberts, Ballard, Spahr, Andrews and Ingersoll, Philadelphia, PA, Rory O. Millson, Alan J. Hruska, Thomas G. Rafferty, Gerald A. Ford, Miriam Hechler Baer, Andrew G. Goredon, Cravath, Swaine & Moore, New York City, John G. Harkins, Jr., Harkins Cunningham, Philadelphia, PA, for Kurt E. Dinkelacker, Michael J. Dillon, movants.

Rory O. Millson, Miriam Hechler Baer, Andrew G. Gordon, Cravath, Swaine & Moore, New York City, for William F. Drake, movant.

Marc Gary, Mayer, Gary A. Orseck, Kathryn Schaefer, Lawrence S. Robbins, Lily Fu Swenson, Brown & Platt, Washington, DC, Edward M. Posner, Drinker Biddle & Reath LLP, Philadelphia, PA, for Ernst & Young LLP, movant.

E. Graham Robb, Weber Goldstein Greenberg & Gallagher, Philadelphia, PA, for Julia Whetman, Judy Peterson, movants.

## MEMORANDUM & ORDER

KATZ, Senior District Judge.

This securities fraud action was originally brought against defendants Ikon Office Solutions, Inc., and several of its officers and directors by plaintiffs who had purchased Ikon stock. Several months after the original complaint was filed, the plaintiffs were granted leave to file an amended complaint that added Ernst & Young, Ikon's accounting firm, as a defendant. Ernst & Young now moves for dismissal of the two counts in which it is named.[1]

### I. Background

Ikon supplies copiers, printing systems, and related services throughout the United States, Canada, and Europe. Its shares are actively traded on the New York Stock Exchange. Beginning in 1995 and continuing into 1998, Ikon purchased close to 200 independent companies, which Ikon then attempted to integrate into its own network. Ikon experienced a variety of problems associated with this "transformation program," particularly with respect to its internal auditing procedures. After a "special review procedure" in the summer of 1998, on August 14, 1998, Ikon announced a $110 million charge to earnings—$94 million in the third fiscal quarter and $16 million against previously reported second fiscal quarter earnings. *See* Compl. ¶ 97.[2] Following this charge, Ikon's stock dropped sharply.

The present motion centers on the role Ernst & Young (E & Y) may have played

---

1. The present memorandum and order discuss two motions to dismiss. The first motion to dismiss addresses the First Amended Complaint, which named Ernst & Young as a defendant in only one count. While that motion was pending, the court granted plaintiffs leave to file a Second Amended Complaint that named E & Y as a defendant in another count (plaintiffs had apparently intended to name Ernst & Young in two counts in the First Amended Complaint but inadvertently failed to do so). The second motion to dismiss addresses the additional count included in the Second Amended Complaint.

2. Unless otherwise noted, all citations to the complaint are to the Second Amended Complaint.

in these problems. Plaintiffs' claims against E & Y are made under Section 11 and Section 10(b) of the Securities Act of 1933 and the Securities Exchange Act of 1934, 15 U.S.C. §§ 77k, 78j(b). Plaintiffs allege that E & Y violated these statutes by (1) issuing an unqualified audit report dated October 15 and 27 of 1997 for the fiscal year ending September 30, 1997, stating that financial statements issued by Ikon conformed with Generally Accepted Accounting Principles (GAAP) and that E & Y's audit itself complied with Generally Accepted Accounting Standards (GAAS),[3] see Compl. ¶ 109 [4]; and (2) permitting the incorporation by reference into a May 1997 securities registration statement of a false or misleading audit opinion on Ikon's fiscal 1996 financial statements. *See id.* ¶ 182. Although the court will subsequently discuss the particular allegations in more detail, plaintiffs focus on several specific problems: internal controls, doubtful accounts, lease default reserves, overstatement of subsidiary income, and allegations that one of Ikon's officers was "cooking" the books. Plaintiffs allege that E & Y was aware of these problems from a very early date but nonetheless continued to issue unqualified statements regarding Ikon's finances.

## II. Legal Standard

A motion to dismiss should be granted only if, accepting all facts pleaded as true and viewing them in the light most favorable to plaintiffs, plaintiffs are still not entitled to relief. In making this assessment, the court should not look to whether plaintiffs will "ultimately prevail"; it should only consider whether they are allowed to offer evidence in support of their claims. *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1420 (3d Cir. 1997) (citations omitted). Complaints alleging securities fraud must also comply with Federal Rule of Civil Procedure 9(b), which requires that fraud be averred with particularity. *See* Fed.R.Civ.P. 9(b).

## III. Section 10(b) Claims

E & Y argues that the court must dismiss plaintiffs' section 10(b) claims

---

**3.** GAAP are the "basic postulates and broad principles of accounting pertaining to business enterprises, approved by the Financial Accounting Standards Board of the American Institute of Certified Public Accounts ("AICPA"). These principles establish guidelines for measuring, recording, and classifying the transactions of a business entity." *SEC v. Price Waterhouse*, 797 F.Supp. 1217, 1222 n. 17 (S.D.N.Y.1992). Similarly, GAAS are the "standards prescribed by the Auditing Standards Board of the AICPA for the conduct of auditors in the performance of an examination.... Rule 202 of the Rules of Conduct of the Code of Professional Ethics of the AICPA requires members to comply with GAAP and GAAS when giving an opinion on financial statements." *Id.* at 1222–23 n. 17 (citations omitted); *see also* Compl. ¶ 167 (describing GAAS).

**4.** The relevant portions of that unqualified audit opinion, dated October 15 and 27, 1997, state:

We have audited the accompanying consolidated balance sheets of IKON Office Solutions, Inc .... and the related consolidated statements of income, changes in stockholders' equity and cash flows for each of the three years in the period ended September 30, 1997....

We conducted our audits in accordance with general accepted auditing standards. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements. An audit also includes assessing the accounting principles used and significant estimates made by management as well as evaluating the overall financial statement presentation. We believe that our audits provide a reasonable basis for our opinion.

In our opinion, the consolidated financial statements referred to above present fairly, in all material respects, the financial position of IKON Office Solutions, Inc., and subsidiaries at September 30, 1997 and 1996, and the consolidated results of their operations and their cash flows for each of the three years in the period ended September 30, 1997, in conformity with generally accepted accounting principles. *Id.* ¶ 109.

made in Count Three of the Second Amended Complaint for several reasons, all of which rest on the premise that plaintiffs have not pleaded their claims with the particularity required by the Private Securities Litigation Reform Act (Reform Act), Rule 9(b) of the Federal Rules of Civil Procedure, and controlling Third Circuit case law.

### A. Standards

Section 10(b) of the Securities Exchange Act makes it unlawful for any person to "use or employ, in connection with the purchase or sale of any security, . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe[.]" 15 U.S.C. § 78j(b). Rule 10b–5, in turn, states in relevant part that it is unlawful to "make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading[.]" 17 C.F.R. § 240.10b–5(b).

The Third Circuit explained the obligations of a plaintiff alleging violations of these requirements:

> The first step for a Rule 10b–5 plaintiff is to establish that defendant made a materially false or misleading statement or omitted to state a material fact necessary to make a statement not misleading. Next, plaintiff must establish that defendant acted with scienter and that plaintiff's reliance on defendant's misstatement caused him or her injury. Finally, since the claim being asserted is a "fraud" claim, plaintiff must satisfy the heightened pleading requirements of Federal Rule of Civil Procedure 9(b).

*In re Burlington Coat Factory,* 114 F.3d at 1417 (citations omitted); *see also* 15 U.S.C. § 78u–4(b)(1) (plaintiffs alleging

Rule 10b–5 violations must "specify each statement alleged to have been misleading, [and] the reason or reasons why the statement is misleading").

■ As plaintiffs have identified the statements in question and defendant has not challenged materiality, the court must look to the scienter and fraud pleadings. A plaintiff must plead facts giving rise to a "strong inference" that the defendant possessed the requisite scienter, that is, the intent to commit fraud. That strong inference of fraud may be established either "(a) by alleging facts to show that defendants had both motive and opportunity to commit fraud, or (b) by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness." *In re Burlington Coat Factory,* 114 F.3d at 1418.

The court also acknowledges the requirements of the Private Securities Litigation Reform Act, 15 U.S.C. § 78u–4(b)(1), which state:

> In any private action arising under this chapter in which the plaintiff may recover money damages only on proof that the defendant acted with a particular state of mind, the complaint shall, with respect to each act or omission alleged to violate this chapter, state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind.

15 U.S.C. § 78u–4(b)(2). The Reform Act does not materially change this court's analysis. *See In re Advanta Corp. Sec. Litig.,* 180 F.3d 525, 535 (3d Cir.1999) ("[I]t remains sufficient for plaintiffs [to] plead scienter by alleging facts establishing a motive and an opportunity to commit fraud, or by setting forth facts that constitute circumstantial evidence of either reckless or conscious behavior.") [5]; *In re Cen-*

---

**5.** The court declines E & Y's invitation to apply the Ninth Circuit's more stringent standards to actions brought under the Reform Act. The holding in *Advanta* simply does not permit such a result: "We believe Congress's use of the Second Circuit's language compels the conclusion that the Reform Act establishes a pleading standard approximately equal in stringency to that of the Second Circuit." *In re Advanta,* 180 F.3d at 534. The Third Cir-

*dant Corp. Litig.*, 60 F.Supp.2d 354, 368–69 (D.N.J.1999) (discussing *Advanta* holding and explaining that Reform Act does not substantially change analysis in this circuit). While the Reform Act does require plaintiffs to state facts with particularity, this language simply reflects the existing requirements of Rule 9. *See In re Advanta*, 180 F.3d at 534.

■ The third step is meeting the requirements of Rule 9(b). To do so, plaintiffs must plead "(1) a specific false representation of material fact, (2) knowledge of its falsity by the person who made it, (3) ignorance of its falsity by the person to whom it was made, (4) the maker's intention that it should be acted upon, and (5) detrimental reliance by the plaintiff." *In re Burlington Coat Factory*, 114 F.3d at 1421, *citing In re Westinghouse Sec. Litig.*, 90 F.3d 696, 710 (3d Cir.1996).

### B. Pleadings in this Case

### 1. Failure to Plead Identity

■ E & Y first argues that the complaint must be dismissed because plaintiffs have alleged wrongdoing by E & Y collectively rather than by naming particular individuals. The court agrees with plaintiffs that they have pleaded identity sufficiently, especially since no individual defendants are named. The statements in question were issued as representations of the corporation Ernst & Young, and it is untenable to suggest that a plaintiff must, at the pleading stage, be able to identify each individual accountant or researcher who may have worked on a particular project. To do so would make the pleading standard virtually impossible to meet. In many places, the plaintiffs have referred to particular memoranda, speakers, or workpapers when there is need for a more particularized allegation, and E & Y cannot argue that the complaint is vague or imprecise. *See, e.g.*, Compl. ¶¶ 111, 113 (discussing various memoranda, workpapers). Nor do the cases cited by defendant stand for the broad proposition suggested.[6]

### 2. Scienter

The heart of E & Y's motion to dismiss is its claim that plaintiffs have failed to allege scienter with the requisite particularity, either by pleading motive and opportunity or by alleging facts that create a strong inference of recklessness or intentional wrongdoing.

■ The "motive and opportunity" test may be disposed of quickly. "Motive would entail concrete benefits that could be realized by one or more of the statements and wrongful disclosures alleged." *In re Aetna Inc. Sec. Litig.*, 34 F.Supp.2d 935, 955 (E.D.Pa.1999). Stressing that E & Y received more than $13 million in fees from Ikon in the course of fiscal years 1996 and 1997, *see* Compl. ¶ 103, plaintiffs essentially argue that E & Y had a strong motive to participate in fraud because doing so enabled it to maximize profits. *See id.* ¶¶ 20(e), 168. The court agrees with defendant that these allegations are not the particularized facts contemplated by the Third Circuit and the Reform Act. *See In re Advanta*, 180 F.3d at 535 ("Motive and opportunity, like all other allegations

---

cuit already adopted many aspects of the Second Circuit's approach in *In re Burlington Coat Factory Securities Litigation*, 114 F.3d at 1418.

**6.** For example, defendant quotes *In re Interneuron Pharmaceuticals Litigation*, 188 F.R.D. 3, 4–5 (D.Mass.1999), for the proposition that plaintiffs "fail[ed] to identify any particular person with knowledge of a particular fraud." Mot. to Dismiss at 9. That portion of the case actually addressed the motion for class certification and ruled that no particular plaintiff had a claim that could meet the heightened pleading requirement; however, the court refused to dismiss the case. *See id.* at 4–5. Similarly, *Kriendler v. Chemical Waste Management, Inc.*, 877 F.Supp. 1140, 1155 (N.D.Ill.1995), and *Fidelity Bank National Association v. Aldrich*, No. 3–95–CV–2566H, 1998 WL 120297, at *3–4 (N.D.Tex. Mar.5, 1998), appear to be concerned with the attribution of statements when several individuals were named.

of scienter . . ., must now be supported by facts stated with particularity and must give rise to a strong inference of scienter."); *see also DiLeo v. Ernst & Young,* 901 F.2d 624, 629–30 (7th Cir.1990) ("Fees for two years' audits could not approach the losses [the accounting firm] would suffer from a perception that it would muffle a client's fraud."); *Zucker v. Sasaki,* 963 F.Supp. 301, 308–09 (S.D.N.Y.1997) (refusing to hold that opportunities for fees, without more, constituted sufficient motive); *In re Health Management, Inc. Sec. Litig.,* 970 F.Supp. 192, 202–03 (E.D.N.Y. 1997) (holding same).[7]

█ Thus, the court must look to other means of pleading scienter. Plaintiffs may plead scienter in a securities fraud claim by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness. Liability premised on recklessness is proper because it "promotes the policy objectives of discouraging deliberate ignorance and preventing defendants from escaping liability solely because of the difficulty of proving conscious intent to commit fraud." *In re Advanta,* 180 F.3d at 535. However,

A reckless statement is one involving not merely simple, or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it.

*Id., quoting McLean v. Alexander,* 599 F.2d 1190, 1197 (3d Cir.1979), *quoting Sundstrand Corp. v. Sun Chem. Corp.,* 553 F.2d 1033, 1045 (7th Cir.1977). "A showing of shoddy accounting practices amounting at best to a 'pretended audit,' or of grounds supporting a representation 'so flimsy as to lead to the conclusion that there was no genuine belief back of it' have traditionally supported a finding of liability in the face of repeated assertions of good faith, and continue to do so." *McLean,* 599 F.2d at 1199. While a mere failure to

investigate does not ordinarily rise above the level of negligence, factual allegations that tend to establish knowledge of the allegedly fraudulent acts may establish recklessness. *See, e.g., Ades v. Deloitte & Touche,* 799 F.Supp. 1493, 1500 (S.D.N.Y. 1992). Numerous, specific violations of GAAP and/or GAAS, along with other "red flags" may also, depending on the allegations, suffice to show scienter under this standard. *See In re Health Management,* 970 F.Supp. at 203.

█ Defendant raises several specific objections to plaintiffs' effort to plead scienter, which, taken together, would require dismissal of the 10(b)–5 count against this defendant if accepted. The court, however, believes plaintiffs successfully allege, at least, recklessness.

Defendant first argues that plaintiffs cannot allege scienter in arguing that E & Y knew that one of Ikon's officers, Kurt Dinkelacker, had been accused of doctoring accounts. Prior to the issuance of the May registration statement, plaintiffs allege that E & Y was informed at an Auditing Committee Meeting that Ikon's CFO Dinkelacker was altering accounts and/or instructing others to do so. Plaintiffs claim that

E & Y was informed of Dinkelacker's wrongful activities at least by April 1997. Handwritten notes contained in a file of E & Y workpapers relating to an April 30, 1997 meeting of the Audit Committee of the Ikon Board of Directors, state, "P Shoemaker to CEO—Kurt instructed everyone to cook the books." On the next page, the same handwritten notes state that one of two "Major items" is that "Kurt is 'cooking the books.'"

*Id.* ¶ 111. According to plaintiffs, E & Y thus placed its imprimatur on Dinkelacker's supposed efforts to misstate financial accounts. *See id.* ¶¶ 112, 156.

---

7. The court understands plaintiffs' response   to concede this argument.

The court agrees with plaintiffs that these allegations, if true, would support a claim of reckless behavior by E & Y. Taken in the light most favorable to plaintiffs, these allegations tend to show scienter for the claims regarding the 1997 audit opinion because they demonstrate that E & Y recklessly failed to investigate a very serious claim that would directly have affected its financial opinion. They also tend to show that E & Y's opinions stating compliance with GAAP and GAAS were misleading. This is particularly true given that plaintiffs have pleaded in great detail that E & Y knew of pervasive financial problems throughout Ikon.[8] E & Y argues that the proper inference from the statements in its workpapers is that "E & Y was fully aware from its own audits that any such allegations were patently false and it knew that outside investigators ... had been brought in to get to the bottom of the allegations." First Mot. to Dismiss at 15. The court, however, cannot rely on defendant's statements regarding an external investigation or Mr. Shoemaker's status as "disgruntled" to disregard plaintiffs' allegations. To do so would require an improper evaluation of factual matters not alleged in the complaint. *See Burlington Coat Factory*, 114 F.3d at 1424–25.

E & Y then more generally argues that none of the allegations pertaining to its knowledge of Ikon's troubled finances demonstrate scienter. The court again disagrees: plaintiffs' allegations regarding the failure of internal controls, doubtful accounts, and overstatement of subsidiary income are all pleaded with sufficient particularity to allege a claim for recklessness, if not conscious behavior.[9]

Plaintiffs focus particularly on the failure of Ikon's internal controls and E & Y's knowledge thereof.[10] Plaintiffs allege that E & Y knew of these problems since at least January 1996 but nonetheless issued the unqualified audit in 1997 and permitted the incorporation of the earlier audit into the May 1997 registration statement. *See id.*

As is perhaps most important in alleging scienter, plaintiffs explain that E & Y could not have believed that Ikon's financial statements were in conformity with GAAP because of its intimate awareness of pervasive economic problems throughout the company's internal controls; accordingly, neither could E & Y claim that its own audit was in compliance with GAAS. Plaintiffs recount E & Y's knowledge of problems during 1996, which ranged from

8. On this point, it is unclear to the court whether plaintiffs intend to plead a separate section 10(b) violation against E & Y with respect to its role in Ikon's May 1997 registration statement. While the plaintiff's response to the motions to dismiss suggested that these claims were meant to stand on their own, the complaint's structure and language leads the court to believe that the plaintiffs intended these allegations only as additional indications of scienter with respect to the 1997 audit opinion.

It is unnecessary to resolve this claim, however, as the court also believes that even if the May 1997 registration statement is taken as an independent 10(b) claim, the allegations regarding Mr. Dinkelacker, combined with the additional allegations of known financial problems throughout Ikon (which are discussed subsequently), demonstrate scienter for the reasons described in the text: assuming the allegations to be true, E & Y's statement that the financial statements complied with GAAP and GAAS were misleading. The

court also finds that the allegations are particular enough to meet the requirements of Rule 9. The plaintiffs state that the financial statement asserted compliance with GAAP, and plaintiffs then specifically allege that a failure to investigate the allegations against Dinkelacker prior to permitting the incorporation of its opinion into the registration statement was a violation of GAAS and GAAP. *See* Compl. ¶¶ 154–56.

9. The plaintiffs also raise a variety of other allegations pertaining to scienter. The court does not rule on these allegations, however, as it rejects defendant's particularized claims regarding the allegations described in the text.

10. The special charges taken in August 1998 included a $16 million restatement of fiscal year second-quarter earnings and a $19 million charge to third-quarter earnings, both related to internal controls. *See* Compl. ¶ 115.

improper revenue recognition to inventory irregularities. *See id.* ¶ 118; *id.* attach A (detailing problems revealed in 1996 audit). On November 1, 1996, E & Y informed Ikon management of these errors, *see id.* ¶ 119, and, in response, E & Y was told to audit approximately 50% of Ikon's operating units in fiscal year 1997. *See id.* ¶ 120. On May 16, 1997, Ikon CFO Kurt Dinkelacker issued a memorandum to the district and marketplace presidents summarizing those internal audits for the first half of fiscal 1997 and stating that he was still "alarmed" at the extent of noncompliance in numerous, specific areas, all of which plaintiffs detail. *See id.* ¶ 121.

Plaintiffs further allege that E & Y knew that the 1996 problems with internal controls had not been remedied when it issued the 1997 audit and permitted the audit's incorporation in public filings. *See id.* ¶ 122; *see also id.* attach. B (providing examples of internal control deficiencies in 1997). Plaintiffs describe a variety of internal memoranda expressing concern that the problems had not been corrected by the time of the September 30, 1997 audit, including a memorandum from Dinkelacker to the district and marketplace presidents on November 26, 1997, stating that there had been no improvements. *See id.* ¶ 123; *see also id.* ¶ 124 (citing memoranda issued throughout Ikon stating that E & Y had been made aware of pervasive problems in inter-company balance reconciliations); *id.* ¶ 125 (stating that E & Y knew as of March 1997 that financial data from a particular information system used in Northern California produced unreliable results); *id.* ¶¶ 126–27 (noting extensive inaccuracies in Los Angeles marketplace).

From these allegations, plaintiffs conclude that E & Y

knew or recklessly disregarded numerous red flags evidencing that the Company's internal controls were grossly deficient and that the financial data being generated by its financial reporting

mechanism was so pervasively inaccurate and unreliable that reliance on that information for financial statement purposes was precluded by GAAP and GAAS. Nevertheless, E & Y improperly issued an unqualified audit opinion on the fiscal 1997 financial statements of IKON, falsely representing, *inter alia,* that those financial statements had been prepared in accordance with GAAP and audited in accordance with GAAS.

*Id.* ¶ 128.

While E & Y claims that allegations regarding flawed internal controls do not show scienter, even the cases cited by defendant acknowledge that internal policies are relevant to scienter to the extent that they correspond to violations of GAAP and GAAS or that they indicate an auditor's awareness of problems in corporate finances. The court agrees that "there can be no claim of fraud based merely on a company's deviation from its own undisclosed internal accounting policies," *In re Cirrus Logic Sec. Litig.,* 946 F.Supp. 1446, 1458 (N.D.Cal.1996); "where, however, a company deviates from its own procedures in a way that violates GAAP, that deviation from internal policy may be evidence of scienter." *Id.* at 1458–59, n. 10; *see also Shapiro v. UJB Fin. Corp.,* 964 F.2d 272, 281–83 (3d Cir.1992) (recognizing that, in some circumstances, accountants' assessments of management practices may give rise to 10b–5 actions).

Plaintiffs' complaint makes just such allegations. The complaint properly compares Ikon's own practices to GAAP, and notes that, while some complied with GAAP, *see* Compl. ¶ 113; others did not. *See id.* ¶ 114 & n. 2. The complaint also alleges that GAAS requires an auditor to make a study of existing internal controls to determine if reliance upon them is appropriate. *See* Compl. ¶¶ 171–72; *see also Jacobs v. Coopers & Lybrand,* No. 97–civ–3374, 1999 WL 101772, at *14–16 (S.D.N.Y. Mar.1, 1999).[11] Plaintiffs stress that E &

---

11. "Plaintiffs more than just allege that the

[accounting firm] failed to adhere to GAAS in

Y's internal audits gave it a deep understanding of the existence and significance of these problems, see Compl. ¶¶ 101–07, and they allege facts suggesting that E & Y had knowledge that the problems it identified in 1996 persisted up to the time the unqualified audit statement was issued. This is supported by plaintiffs' claims that the same items E & Y had highlighted as problematic in 1996 were the source of many of the charges in 1998. In short, plaintiffs' allegations regarding E & Y's knowledge of the failure of internal controls and the significance of those problems are relevant claims of scienter.

E & Y also maintains that plaintiffs' allegations regarding allowances for doubtful accounts receivable, lease default reserves, and the overstatement of subsidiary income do not properly plead scienter as they merely show changed circumstance rather than fraud. The court disagrees, as, in each case, the plaintiffs explain in great detail why E & Y knew the charges should have been taken in 1997 rather than in 1998.[12]

As to the allowance for doubtful accounts, plaintiffs allege that E & Y knew or recklessly disregarded that Ikon's allowance for doubtful accounts receivable was understated by at least $24 million in the fiscal 1997 financial statement, in violation of Ikon's internal policy. According to plaintiffs, E & Y was aware of this problem because of its visits to various sites; plaintiffs also refer to schedules prepared by district presidents and CFOs in spring 1998 showing noncompliance of $24 million based on September 30, 1997, information. See id. ¶¶ 129–32. Plaintiffs argue that these errors were a particularly significant "red flag" because E & Y acknowledged that Ikon's reserve policy was

designed to comply with GAAP. See id. ¶ 113.

Similarly, plaintiffs allege that E & Y should have taken the charge for lease default reserves at least as of September 30, 1997. According to plaintiffs, although E & Y's September 30 workpapers explained that the actual default rate was over 4.8% of outstanding portfolio balance, E & Y acquiesced in a reserve equivalent of only 3.2% based upon unsupported claims by Ikon personnel that contradicted E & Y's own findings. See id. ¶ 133. Plaintiffs allege that if the reserve had been taken based on actual charge-offs experienced, the reserve would have been increased significantly, with a corresponding reduction in pre-tax income. See id. ¶ 135. Ikon's internal policy required at least $10 million more in stated reserves and thus should have been another particularly telling red flag. See id. ¶ 136.

Finally, plaintiffs discuss the charges taken in 1998 regarding one of Ikon's subsidiaries, Integra Technology International Corporation, focusing particularly on why E & Y should have known of the need to take charges well prior to 1998. E & Y's workpapers from August 1997 show that Integra had lost $645,000 instead of producing $1.3 million in projected profit; Integra also had approximately $8.5 million less in sales than predicted. See id. ¶ 142. Although E & Y's audit stated accounting standards did not require an impairment write-down under GAAP, see id. ¶ 143, E & Y's workpapers contain a memorandum setting forth indications of impairment, including operating losses and a lack of profitability. See id. Plaintiffs allege that E & Y knew that Ikon was required by GAAP to perform an updated discounted cash flow estimate to see if the asset had

its audit[.] They put this failure in a broader context with allegations that, taken together, paint a portrait of an audit so reckless that a jury could infer intend to defraud." Id. at *14.

12. The 1998 charge included a $20 million increase in the allowance for doubtful ac-

counts, a $28 million charge reflecting an increase in the reserve for lease defaults, and a $20 million charge for asset impairment with respect to one of its subsidiaries, Integra Technology International Corporation. See Compl. ¶¶ 132, 135, 138.

been impaired; Ikon did not perform such an assessment, and E & Y required no such estimate. *See id.* ¶ 144.

In short, as to each of these problem areas, plaintiffs explain in detail why E & Y should have known that charges needed to be taken long before August 1998. The court agrees that Rule 10b–5 liability does not attach "merely because 'at one time the firm bathes itself in a favorable light' but 'later the firm discloses that things are less rosy.'" *In re Advanta,* 180 F.3d at 538, *quoting DiLeo,* 901 F.2d at 627. However, the allegations here do not merely describe fraud in hindsight: they state that E & Y was aware of serious discrepancies that made it impossible to certify Ikon's financial statements. In arguing that plaintiffs are overly vague, defendant ignores the various internal memoranda and workpapers cited by plaintiffs. While E & Y again argues that the violations, if they occurred, were only with respect to internal policy, the complaint clearly alleges that the lack of compliance with corporate policy was an indication that Ikon's financial situation was precarious and its practices did not comply with GAAP.

Finally, defendants allege that plaintiffs do not identify how E & Y failed to comply with GAAS and GAAP. Defendant is correct that plaintiffs may not merely allege violations of GAAP and GAAS; rather, plaintiffs must "state what the unreasonable practices were and how they distorted the disclosed data." *In re Burlington Coat Factory,* 114 F.3d at 1417–18; *see also Shapiro,* 964 F.2d at 284–85 (emphasizing that plaintiffs must provide specific allegations regarding the accounting practices and how they deviated from what is reasonable).

Plaintiffs have met this burden. Each of plaintiffs' allegations of violations of GAAP or GAAS refer back to the specific claims regarding E & Y's knowledge of problems. Plaintiffs describe the GAAP requirements for recognition of revenue in the proper period, *see* Compl. ¶ 159; sections pertaining to recognition of loss contingencies and asset impairment, *see id.* ¶¶ 161–63; the need to assess internal controls, *see id.* ¶ 164; and the need to restate conclusions in light of changed circumstances. *See id.* ¶ 165. Similarly, plaintiffs describe GAAS provisions requiring independence of the auditor, *see id.* ¶ 168; the requirement of due professional care, including the need to verify employee representations, *see id.* ¶¶ 169–70; the need to evaluate internal controls, *see id.* ¶¶ 171–72; the need to consider computer processing effects on financial statements subject to audit, *see id.* ¶ 173; and the need to perform audit procedures to confirm estimates provided by a client. *See id.* ¶ 174. While the complaint is not necessarily structured in the most organized manner, it identifies the offending financial practices and explains how those practices violated GAAP and/or GAAS.[13]

## C. Conclusion

The court finds that plaintiffs have properly pleaded at least recklessness. As the court in *In re Health Management* ruled,

the plaintiffs have alleged that the violation of auditing principles resulted in material misstatements of fact in the financials, and that [the defendant] failed to follow proper audit procedures. These allegations, combined with the allegations of [defendant's] ignorance of numerous "red flags" are adequate to suggest that [defendant] turned a blind eye to ... fraudulent activities, thus creating a "strong inference" of [defendant's] recklessness.

970 F.Supp. at 203; *see also Ades,* 799 F.Supp. at 1500–01 (holding that plaintiffs pled recklessness sufficiently because "allegations raise the inference that [the ac-

---

**13.** Defendant's remaining allegations argue that the plaintiffs have made conclusory allegations in paragraphs 124, 125, 127, and 138.

However, defendants' objections seek an excessive level of detail.

counting firm] suspected something was amiss ... yet failed to take further steps to determine the nature of the problem before issuing the Review Report and Consent Letter"). The court notes that the arguments made by E & Y in this motion are strikingly similar to those made by it and rejected by the court in *In re Cendant Corporation Litigation*, 60 F.Supp.2d 354, 371–74 (D.N.J.1999). The *Cendant* court recently denied E & Y's motion to dismiss, stating that claims that E & Y had, *inter alia*, failed to verify management statements, had failed to investigate internal controls, and had acquiesced in incorrect revenue recognition alleged recklessness with sufficient specificity to permit the cause of action to continue. *See id.*

## IV. Section 11 Claims

E & Y argues that plaintiffs' section 11 claims in Count One of the Second Amended Complaint must be dismissed because they also fail to plead fraud with particularity and because the plaintiffs have failed to comply with the pleading requirements regarding the statute of limitations.

### A. Failure to Plead Fraud with Particularity

Section 11 creates a cause of action for "cases in which a registration statement either contains an untrue statement of material fact or omits a material fact that is required or necessary to make the other statements therein not misleading." *Klein v. GNC, Inc.*, 186 F.3d 338, 342–43 (3d Cir.1999).[14] Plaintiffs allege that Ikon's May 1997 registration statement was "inaccurate and misleading" because it did not disclose material facts regarding failures of internal controls and the overstatement of income and because it "incorporated by reference financial statements that failed to conform to the requirements of GAAP, and thus were presumptively misleading and inaccurate pursuant to Regulation S–X, 17 C.F.R. 210.4–01(a)(i) [.]" Compl. ¶ 182.

The court agrees with defendant that these allegations sound in fraud and that plaintiffs must therefore comply with Rule 9(b). *See Shapiro v. UJB Fin. Corp.*, 964 F.2d 272, 288 (3d Cir.1992).[15] Count One alleges first that the May 1997 registration was inaccurate and misleading because it concealed and failed adequately to disclose facts pertaining to internal controls and material overstatement of income; plaintiffs also allege that E & Y did not comply with GAAP. *See* Compl. ¶ 182. Plaintiffs next allege that E & Y violated GAAS by permitting the incorporation by reference of the audit report on its 1996 fiscal year financial statements when it failed to conduct further investigation subsequent to its discovery of unreliable financial information and the accusations that Dinkelacker had been cooking the books. *See id.* ¶ 183. The section of the complaint in which these allegations are made is titled "E & Y

---

14. As is relevant to the present case, section 11 states:

In case any part of the registration statement, when such part became effective, contained an untrue statement of material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein not misleading, any person acquiring such security (unless it is proved that at the time of such acquisition he knew of such untruth or omission) may, either at law or in equity, in any court of competent jurisdiction, sue ... every accountant ... or any person whose profession gives authority to a statement made by him, who has with his consent been named as having prepared or certified any part of the registration statement, or as having prepared or certified any report or valuation which is used in connection with the registration statement, with respect to the statement in such registration statement, report, or valuation, which purports to have been prepared or certified by him[.]

15 U.S.C. § 77k(a)(4).

15. If the allegations sound in negligence, Rule 9 has been held not to apply. *See In re Chambers Dev. Sec. Litig.*, 848 F.Supp. 602, 624 (W.D.Pa.1994); *Copland v. Grumet*, Civ.A. No. 96–3351, 1998 WL 256654, at *4 (D.N.J. Jan.9, 1998); *see also Shapiro*, 964 F.2d at 288 (strongly suggesting same without explicitly so holding).

knowingly or recklessly violated GAAS by consenting to the incorporation by reference of its audit report for Ikon's 1996 financial statements in the May 1997 registration statement." *Id.* at 83.

Count One attempts to exclude those allegations that sound in fraud, *see* Compl. ¶ 177, but the court must look behind plaintiffs' own designations to the underlying claims. *See Shapiro*, 964 F.2d at 288. It is clear that plaintiffs accuse E & Y of committing more than mere negligence: the allegations supporting the charges against E & Y regarding the registration statement accuse E & Y of willfully disregarding evidence of false account information and pervasive financial problems throughout Ikon. Similarly, the allegations pertaining to E & Y's awareness of the problems with Dinkelacker are described as far more than simple negligence. As the *Shapiro* court noted, "the complaint is devoid of allegations that defendants acted negligently in violating [section 11]. Instead, it brims with references to defendants' intentional and reckless misrepresentation of material facts. We see no way to construct a negligent cause of action here." *Shapiro*, 964 F.2d at 288. The court's conclusion is also supported by plaintiff's response to the first motion to dismiss.[16]

However, plaintiffs have adequately pleaded fraud even under the standards required by Rule 9. "The purpose of Rule 9(b) ... is 'to place the defendants on notice of the precise misconduct with which they are charged, and to safeguard defendants against spurious charges of immoral and fraudulent behavior.'" *In re*

U.S. *Healthcare, Inc. Sec. Litig.*, 122 F.R.D. 467, 468 (E.D.Pa.1988) (citations omitted). Accordingly, a plaintiff must, at the minimum, plead "the time, place and content of the false misrepresentation, the fact misrepresented, and what was given up as a consequence of the fraud." *Pell v. Weinstein*, 759 F.Supp. 1107, 1118 (M.D.Pa.1991) (citations, internal punctuation omitted). Plaintiffs have done so.[17]

The gist of the section 11 claim is that E & Y behaved recklessly in permitting the incorporation of its audit into the 1997 registration statement when E & Y was aware of the pervasive financial problems plaguing Ikon. As described more completely in the previous section, plaintiffs allege that Ikon's 1996 audit revealed "numerous breakdowns in Ikon's internal control systems at various Ikon subsidiaries," Compl. ¶ 118, and that these breakdowns "caused widespread errors in Ikon's accounting records and impaired the ability of Ikon to prepare financial statements in conformity with GAAP." *Id.; see also id.* attach A (detailing problems identified in 1996 audit). Count One explains that AU § 711 prohibits an independent auditor from consenting to the incorporation of a report without performing a subsequent events review to "see whether material developments have occurred subsequent to preparation of the report being incorporated by reference." *Id.* ¶ 155. If such material events have occurred, under GAAS, the "auditor must investigate the impact such events may have had on the opinion incorporated by reference." *Id.*[18] As plaintiffs explain, the May 1997 registration

---

16. There, plaintiff argued that the allegations pertaining to the May 1997 registration statement and the 1996 audit report supported a finding of intentional or reckless deception by E & Y. *See* Resp. at 17, 19–20, 29–31.

17. The court does not believe that defendant has argued in favor of applying the strict standards of the Reform Act to this count, and the court looks only to the Rule 9 standards that have previously governed section 11 claims.

18. Thus, this case is distinguishable from those in which the complaint was dismissed because the plaintiffs failed to specify the accounting or auditing principle at issue. *See, e.g., Christidis v. First Pa. Mortgage Trust*, 717 F.2d 96, 100 (3d Cir.1983) (rejecting 9(b) claim largely because of failure to identify accounting or auditing standards); *Pell*, 759 F.Supp. at 1119 (noting that plaintiffs did not "identify any specific accounting principle or auditing standard which was violated").

statement was effective on May 6, 1997. *See* Compl. ¶ 156. "By that time, E & Y had been informed at an Audit Committee that Dinkelacker was 'cooking the books' as alleged above. By that time, E & Y was also knowledgeable with respect to the severe and pervasive deficiencies in IKON's system of internal controls and the widespread failure within Ikon to comply with Ikon's established accounting practices." *Id.* That is, plaintiffs have made allegations that E & Y's awareness of the possibility that one of Ikon's CFOs was doctoring accounts, combined with the acknowledged problems in Ikon's finances, made it potentially fraudulent for E & Y to permit the incorporation of its previous statement without some investigation into the allegations against the CFO. This is sufficient to meet the requirements of Rule 9(b): plaintiffs have described the false statement in the registration statement, when it was made, and why and how it was misleading.

E & Y argues that plaintiffs cannot base a fraud claim on subsequent events, but the cases it cites for this proposition are either distinguishable or actually support plaintiff's position. For example, one case relied upon by defendant, *Ingenito v. Bermec Corporation*, 441 F.Supp. 525 (S.D.N.Y.1977), examined Rule 10(b) claims, see *id.* at 549, and addressed a motion for summary judgment rather than a motion to dismiss. *See id.* As that court acknowledged, "[i]n connection with a registration statement, an accountant is under an additional obligation to conduct a reasonable inquiry, but not an audit, to discover whether events subsequent to the audit period up to the effective date of the registration require disclosure in order to maintain the integrity of the portrayal." *Id.* Plaintiffs allege that E & Y had information that should have raised just such questions of integrity. Similarly, *Ahern v. Gaussoin*, 611 F.Supp. 1465 (D.Or.1985), *limited on other grounds in Securities*

*Investor Protection Corp. v. Poirier*, 653 F.Supp. 63 (D.Or.1986), addressed a summary judgment motion and explicitly stated that accountants may be liable under section 11 for subsequent events in some situations: "Subsequent events occurring up to the effective date of the registration statement are relevant to show either that the financial statement was false when made or that it *had become misleading.*" *Id.* at 1483. Plaintiffs have alleged such information was in E & Y's possession prior to the effective date of the registration, and accordingly, they have pleaded in compliance with Rule 9(b).

**B. Statute of Limitations**

▮▮▮▮ Defendant argues that plaintiffs' section 11 claims against it are time-barred. To be timely, actions must be "brought within one year after the discovery of the untrue statement or omission or after such discovery should have been made by the exercise of reasonable care, and in no event 'more than three years after the sale.'" *Brantley v. E.F. Hutton & Co., Inc.*, 710 F.Supp. 135, 140 (E.D.Pa. 1989), *quoting* 15 U.S.C. § 77m. The complaint must describe the "time and circumstances of the discovery of the fraudulent statements, the reasons why discovery was not made earlier if more than one year has elapsed since the fraudulent conduct occurred, and the diligent efforts which plaintiff undertook in making or seeking such discovery." *Alfaro v. E.F. Hutton & Co., Inc.*, 606 F.Supp. 1100, 1112 (E.D.Pa. 1985); *see also Brantley*, 710 F.Supp. at 140 (same).[19]

Plaintiffs have met their burden, even assuming the action was filed outside of one year. In addition to the paragraph stating that the plaintiffs could not have known earlier of the fraudulent statements and that they exercised due diligence, *see* Compl. ¶ 185, the remainder of the complaint makes it clear that the plaintiffs only began investigating the behavior of

---

**19.** While plaintiffs suggest that *Alfaro* is irrelevant as it addressed a section 12 claim rather than a section 11 claim, 15 U.S.C. § 77m applies equally to both causes of action.

Ikon and, eventually E & Y, after the stock prices dropped following the charges that were made in August 1998. Also, as previously described, the plaintiffs cite the workpapers and other materials that provided the basis for the allegations that E & Y knew of Dinkelacker's alleged behavior and the pervasive problems in Ikon's finances through 1996. The complaint makes it clear that these materials were revealed only through discovery. Defendant cannot seriously contend that stockholders, regardless of their due diligence, should have been able to discover this information on their own prior to the decline in stock prices.

## V. Procedural Arguments

### A. The Addition of Ernst & Young as a Party

In a letter memorandum dated June 22, 1999, plaintiffs asked the court for permission to file an amended complaint, and the court granted permission. *See* Order of June 24, 1999. Defendants now maintain that the court never explicitly granted permission to add E & Y.[20] The court disagrees: plaintiffs' memoranda clearly explained that they wished to file an amended complaint to add E & Y as a defendant, and, in support of this request, plaintiffs explained what new information had come to light. The response from Ikon argued against this action. That is, both parties clearly understood that plaintiffs were asking permission to amend the complaint to add a new party, a practice that has been followed in this circuit. *See, e.g., Cahill v. Carroll,* 695 F.Supp. 836 (E.D.Pa. 1988); *CFTC v. American Metal Exchange Corp.,* 693 F.Supp. 168, 189–90 (D.N.J.1988).

Defendant then argues, in the alternative, that the court should dismiss E & Y. While acknowledging that addition of a party is within the discretion of the trial court, *see, e.g., Arch v. American Tobacco Co., Inc.,* 984 F.Supp. 830, 842 (E.D.Pa. 1997), E & Y claims that adding it will either delay the resolution of the case as a whole by requiring continued discovery or will deprive E & Y of the needed time to prepare. As the court explained in an earlier order, *see* Order of July 10, 1999, it will provide E & Y with whatever time for discovery is reasonably required. Thus, the only stated ground for prejudice is simply not a consideration. As to the risk of delaying the case as a whole, any incidental delay is more acceptable than would be a large number of separate actions, particularly given the congruence of discovery issues between the defendants. The plaintiffs in this action have an interest in the efficient adjudication of their claims, and forcing them to litigate the same issues at least two times would be harmful to them. The court sees no evidence of bad faith by the plaintiffs; nor has there been any needless delay. *See Cahill,* 695 F.Supp. at 838; *see also Boileau v. Bethlehem · Steel Corp.,* 730 F.2d 929, 937–38 (3d Cir.1984) (suggesting liberal amendment so long as no prejudice is proved).

### B. Service Issues

■ E & Y argues finally that this court should dismiss the claim against it for plaintiffs' failure to comply with the court's order regarding the date of service. The court declines to do so, as the same factors militating against separate actions discussed in the previous section apply equally here.[21]

**20.** E & Y relies on Rule 21 of the Federal Rules of Civil Procedure but acknowledges that many courts have applied Rule 15 in these circumstances.

**21.** Defendant argues strenuously that this court must dismiss the action against it. However, although defendant moves for dismissal pursuant to Federal Rule of Civil Procedure 41(b), which permits dismissal for failure to comply with court order, most of the cases cited rely on Federal Rule of Civil Procedure 4. While the court acknowledges that the Third Circuit has often applied Rule 4 strictly, even that the provisions of that Rule may be affected by the need for extensions or for good cause. *See, e.g., In re City of Phila-*

## VI. Conclusion

The court finds that the plaintiffs have pleaded their allegations with sufficient specificity to meet the requirements of Third Circuit case law and the Reform Act. Plaintiffs allege with great detail the particular aspects of Ikon's finances that made E & Y's statements "reckless" and have also alleged particular bases for stating that E & Y knew of these problems. Moreover, the court finds that the need to litigate this case in one action weighs heavily against dismissing the claim for any of the procedural reasons raised by defendant.

An appropriate Order follows.

### ORDER

**AND NOW,** this 14th day of September 1999, upon consideration of Defendant Ernst & Young's Motion to Dismiss the First Amended Complaint, Defendant Ernst & Young's Motion to Dismiss the Second Amended Complaint, and the responses and replies thereto, it is hereby **ORDERED** that the Motions are **DENIED.**

*delphia Litig.,* 123 F.R.D. 515, 520 (E.D.Pa. 1988) (explaining such circumstances). More importantly, the only case defendant cites for the proposition that dismissal under Rule 41(b) is mandatory is an unpublished opinion, *Thompson v. Kramer,* Civ.A. No. 93–2290, 1994 WL 702927 (E.D.Pa. Dec.13, 1994), with very different facts. *See id.* at *10.